IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ORIGINAL
RECEIVED

2006 MAR 14 P 4: 36

PETRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

BENNY L. WRIGHT and KATHERINE )
E. WRIGHT, as parents and next )
friends of JESSICA W., a minor child, )
                                      )
        Plaintiffs,                   )
                                      )
vs.                                   )        CIVIL ACTION NO.
                                      )        2:05cv699-T
THE CHILTON COUNTY BOARD OF           )
EDUCATION, et al.,                    )
                                      )
        Defendants.                   )

---

## PLAINTIFFS' CONSOLIDATED RESPONSE
## IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

---

(i) STATEMENT IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT;
(ii) NARRATIVE SUMMARY OF FACTS;
(iii) MEMORANDUM BRIEF & CITATION OF AUTHORITIES;
(iv) OPPOSING AFFIDAVIT; AND
(v) NOTICE OF FILING OF DEPOSITION TRANSCRIPTS

---

GEORGE E. JONES, III
ATTORNEY AND COUNSELOR AT LAW
711 Alabama Avenue
P. O. Box 9
Selma, Alabama 36702-0009

Ala. Bar I.D. ASB-9546-S82G
Attorney for PLAINTIFFS

### PLAINTIFFS' STATEMENT
### IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

*1.*

*There are indeed genuine issues of material fact and THE DEFENDANTS are not entitled to summary judgment as a matter of law.  PLAINTIFFS have submitted substantial evidence supporting the allegations of each of their causes of action in the form of deposition testimony and a counter-affidavit.   Summary Judgment is therefore inappropriate.*

*2.*

*DEFENDANTS' argument that PLAINTIFFS have failed to exhaust their administrative remedies is specious, but it must fail because it does not address the various legally recognized exceptions to the exhaustion of administrative remedies rule. See , e.g., the legal authorities cited and discussed by PLAINTIFFS at pages 30 through 32, infra, this brief.*

*3.*

*PLAINTIFFS have submitted substantial evidence that it would be futile or improbable to obtain adequate relief by exhausting administrative remedies under the IDEA thus precluding summary judgment. See, e.g., the legal authorities cited and discussed by PLAINTIFFS at pages 30 through 32, infra, this brief.*

*4.*

*PLAINTIFFS have submitted substantial evidence that PLAINTIFF JESSICA W.  Is entitled to special education services under the IDEA so as to preclude summary judgment.*

*See, e.g., PLAINTIFFS' narrative summary of facts at pages 15 and 16, infra, this brief.*

5.

While the individual DEFENDANTS may or may not be immune from suit in their official capacities under one or more of the PLAINTIFFS' theories of recovery, they are not immune from suit in their individual capacities where they have acted willfully, maliciously, fraudulently, and in bad faith. *See, e.g., the legal authorities cited and discussed by PLAINTIFFS, infra, this brief.*

6.

PLAINTIFFS submit that their claims under 42 U.S.C. § 193 are not attempts to circumvent the administrative procedures provided for in the IDEA. *See, e.g., the legal authorities cited and discussed by PLAINTIFFS, infra, this brief.*

7.

The individual DEFENDANTS are not entitled to qualified immunity because they have violated clearly established constitutional and statutory rights of PLAINTIFF JESSICA W. of which a reasonable educator would have known. *See, e.g., the legal authorities cited and discussed by PLAINTIFFS, infra, this brief.*

8.

PLAINTIFF JESSICA W. concedes that she has no property interest in becoming a cheerleader. In the matter as bar, the DEFENDANTS' conduct in violating their own written rules with respect to cheerleader selection serves to illustrate how pervasive the DEFENDANTS' mistreatment of LITTLE JESSICA has been in violation of I.D.E.A.

*9.*

PLAINTIFFS concede that they cannot establish a constitutional violation *per se* based upon certain DEFENDANTS' refusal to allow her access to the restroom. Nevertheless, it does serve to illustrate how pervasive the DEFENDANTS' mistreatment of LITTLE JESSICA has been in violation of I.D.E.A.

*10.*

PLAINTIFFS submit that a genuine issue of material fact exists as to whether or not comments made to the PLAINTIFF STUDENT, by DEFENDANTS FINLAYSON, BAKER, and ELLISON, rise to the level of the tort of outrage under Alabama law. Moreover, PLAINTIFFS submit that there is substantial evidence in the form of deposition testimony tending to show that DEFENDANTS' denial of special benefits and services to PLAINTIFF student rises to the level of a violation of IDEA.

*11.*

PLAINTIFFS submit that there is substantial evidence in the form of deposition testimony that the PLAINTIFF STUDENT suffered physical pain and suffering as well as emotional distress when she was not allowed to use the restroom during instructional time.

*12.*

PLAINTIFFS submit that a genuine issue of material fact exists as to whether PLAINTIFFS' federal claims rise to the level of a constitutional or federal violation. *See, e.g.*, the legal authorities cited and discussed by PLAINTIFFS, *infra*, this brief..

*13.*

PLAINTIFFS' claims against the individual educator DEFENDANTS in their official

capacities are not redundant of their claims against THE CHILTON COUNTY BOARD OF EDUCATION because the educator DEFENDANTS are subject to declaratory and injunctive relief in their official capacities.

14.

There is a genuine issue of material fact as to whether or not the acts of the individual DEFENDANTS satisfy the required elements of the tort of outrage. *See*, *e.g.*, the legal authorities cited and discussed by PLAINTIFFS, *infra*, this brief.

15.

PLAINTIFFS do not seek monetary damages in their state-law claims against THE CHILTON COUNTY BOARD OF EDUCATION. PLAINTIFFS' claims for monetary damages are asserted only against individual members of the said board and not against the board itself.

16.

DEFENDANTS MILDRED ELLISON and individual board members are not automatically entitled to state-agent immunity as to PLAINTIFFS' state-law claims of negligent and wanton supervision. *See*, *e.g.*, the legal authorities cited and discussed by PLAINTIFFS, *infra*, this brief.

17.

PLAINTIFFS submit that the individual DEFENDANT EDUCATORS AND BOARD MEMBERS are not entitled to summary judgment because there is/are genuine issue(s) of material fact with respect to the element of wantonness.

-5-

*18.*

*DEFENDANT EDUCATORS ELLISON, FINLAYSON, and BAKER are not protected by federal immunity because deposition testimony indicates that there existed sufficient caselaw establishing the contours of the minor PLAINTIFF'S constitutional rights such that the unlawfulness of the DEFENDANTS' conduct would have been apparent to a reasonable official in the same circumstances.*

*19.*

*PLAINTIFFS submit that there is substantial evidence in the form of deposition testimony that one or more of the DEFENDANTS has/have acted negligently.*

*20.*

*PLAINTIFFS submit that any argument that their state-law claims are an indirect attempt to assert a claim for "educational malpractice" is without merit and most certainly does not support a summary judgment in favor of THE DEFENDANTS.*

*21.*

*PLAINTIFFS submit that summary judgment is not appropriate to the parents' claims for loss of services because the minor child's underlying claims are meritorious and each count states a prima facie claim.*

*22.*

*PLAINTIFFS submit that their claims for declaratory and injunctive relief properly state a claim upon which relief can be granted.*

### PLAINTIFFS' NARRATIVE SUMMARY OF FACTS

*For purposes of summary judgment the PLAINTIFFS present either undisputed facts or the facts taken in the best light to the PLAINTIFFS' claims raised in their complaint.*

### A.    Introduction and Procedural History

*PLAINTIFFS, Benny Wright, Katherine Wright, and their daughter, JESSICA W., filed this action against The Chilton County Board of Education, it's members, the superintendent of schools (Mildred Ellison), a schoolteacher (DARYL BAKER), and a school principal (DONNIE FINLAYSON), alleging that PLAINTIFF JESSICA W., a student presently enrolled in the eighth grade in Chilton County public schools, was illegally and improperly denied rights, benefits, and services under The Individuals with Disabilities in Education Act ("I.D.E.A."), which is codified at 20 U.S.C.S. § 1400 et seq.  (Complaint). PLAINTIFF JESSICA W. suffers from a terminal disease, cystic fibrosis, and PLAINTIFF contends, she is therefore a handicapped child who is eligible for special education and related services under I.D.E.A. because her ability to learn is impacted by her health issues. (Complaint, pages 2 and 3; complaint, page 11, paragraph 21; Id., page 12, paragraph 23).*

*PLAINTIFF JESSICA W.  has been a student in the CHILTON COUNTY public schools since approximately 2001.  During the 2002-2003 academic school year LITTLE JESSICA was enrolled in the fifth (5th) grade at Chilton Intermediate School.  During the 2003-2004 academic school year she was enrolled in the sixth (6th) grade at Clanton Middle School.  During the 2004-2005 academic school year LITTLE JESSICA was*

enrolled in the seventh (7th) grade at Clanton Middle School. She remains at Clanton Middle School in the eighth (8th) grade during the current 2005-2006 academic school year. (J. WRIGHT DEPO, page 26, lines 9 through 19; Id., page 27, lines 1 through 23: K. WRIGHT DEPO, page 18, lines 4 through 6; Id., page 48, lines 1 through 16; Id., page 85, lines 1 through 23; Id., page 86, lines 1 through 21; and Id., page 88 lines 16 through 23).

PLAINTIFFS contend that Little JESSICA cannot benefit from the education she has been receiving because school officials refuse to accommodate her special needs by formulating an "Individual Education Program" (I.E.P.). Without an I.E.P. there is no process by which JESSICA can receive services or accommodations for her special needs which have been brought on by her terminal illness. Ideally an I.E.P. for a child with cystic fibrosis would accommodate the child's special needs in a number of ways. An I.E.P. would allow the child to carry enzyme pills to school for consumption during the course of the school day. Children with C.F. suffer from enzyme deficiencies. A child with C.F. also needs to be seated in class away from other schoolchildren who are sick. This is because C.F. patients have a compromised immune system. Without an I.E.P. JESSICA'S teachers can seat her wherever they want to. A child with C.F. has to make frequent trips to the bathroom because she must drink lots of fluids. Under an I.E.P. the child would be authorized to get up out of her seat and go to the bathroom without getting permission from the teacher. An I.E.P. for a child with C.F. may also include the administration of medication by the school nurse, special tutoring for the child, and the issuance of a second set of textbooks for the child's use at home. In addition, PLAINTIFFS seek monetary damages under The I.D.E.A. and 42 U.S.C. § 1983, as well as under several

state-law theories of recovery, for physical injury and emotional injury to Little JESSICA, as well as for emotional injuries to the parents (Complaint, page 12, paragraph no. 24).

### B.    *Factual Background*.

PLAINTIFF JESSICA W. suffers from a terminal disease known as cystic fibrosis and she has been diagnosed as terminally ill.  Cystic fibrosis (hereinafter referred to as "C.F.") is defined as "[a]n inherited disease of [the] exocrime glands affecting the pancreas, respiratory system, and apocrine glands. [It] usually begins in infancy and is characterized by chronic respiratory infection, pancreatic insufficiency, and increased electrolytes in sweat. [It] is the major cause of severe chronic lung disease in children. . . the etiology and primary defect of cystic fibrosis are unknown." **Taber's Cyclopedia Medical Dictionary** at 485 (17th edition 1993).  "Median cumulative survival is approximately 20 years." Id. JESSICA is presently thirteen (13) years of age. (Complaint, page 11, paragraph 20).  Little JESSICA'S illness is thought to be a genetic disease.  She also suffers from cirrhosis of the liver which is believed to be caused by the C.F. (K. WRIGHT DEPO, page 45, lines 14 through 23; page 46, lines 1 thought 14).  Mucus causes sludging in LITTLE JESSICA'S liver causing it to malfunction and this results in cirrhosis (Id.)  LITTLE JESSICA'S C.F. has also resulted in diabetes (K. WRIGHT DEPO, page 46, lines 1 through 14; J. WRIGHT DEPO, page 112, lines 1 through 23).  LITTLE JESSICA is also being treated with asthma inhalers. (J. WRIGHT DEPO, page 114, lines 1 through 23).   LITTLE JESSICA is frequently hospitalized for C.F. at Children's Hospital in Birmingham, sometimes twice a year and sometimes three to four times a year.  (K. WRIGHT DEPO, page 51, lines 14

through 23; Id., page 178, lines 15 through 18; J. WRIGHT DEPO, page 80, lines 1 through 23; Id., page 113, lines 4 and 5).  Each hospitalization of LITTLE JESSICA is for approximately two (2) weeks. (K. WRIGHT DEPO, page 86, lines 20 though 22; Id., page 87, lines 1 though 22; J. WRIGHT DEPO, page 80, lines 1 through 23).  Twice each day LITTLE JESSICA has to undergo breathing treatments at home.  She has to wear a vest hooked up to a breathing machine that breaks up the mucus inside her lungs. (K. WRIGHT DEPO, page 95, lines 11 though 23; Id., page 96, lines 1 though 17)  It is singular to note that when she was permitted to be a cheerleader, LITTLE JESSICA only had to endure the breathing treatment one (1) time a day instead of two (2). (K. WRIGHT DEPO, page 96, lines 1 though 23; Id., page 97, lines 1 though 7).  LITTLE JESSICA also had a portal entrance surgically inserted into her side for intravenous injections of her medications. (J. WRIGHT DEPO, page 150, lines 12 through 23).  LITTLE JESSICA'S condition will eventually deteriorate to the point where she will have to carry an oxygen tank with her. (K. WRIGHT DEPO, page 166, lines 1 through 5).  LITTLE JESSICA has frequently come home from school with stomach pains.  "She came home most every day with stomach pains.  They - - when she does not go to the bathroom correctly, then that's just one of the - - bowels build up, and she just - - we've sat many times and I've watched her just cry; just doubled over and cry.  And it would make me mad because I knew that [it] could be prevented." (K. WRIGHT DEPO, page 173, lines 3 through 11).  Several of the child's medications make her sick resulting in vomiting. (Id., page 173, lines 12 through 18).  LITTLE JESSICA'S digestive problems are so severe that sometimes she sits on the toilet for hours at a time trying to relieve herself. (K. WRIGHT DEPO, page 174, lines 10 through

19).

### C.    *Notice to Defendants of Little Jessica's Disability*

There is substantial deposition testimony before the Court tending to show that the DEFENDANTS had both actual and constructive notice of the fact that LITTLE JESSICA suffers from a disability.  The child's mother testified that LITTLE JESSICA had an I.E.P. while in enrolled in the fourth (4th) grade in the Jackson County, Alabama school system. (K. WRIGHT DEPO, page 52, lines 5 through 20).  LITTLE JESSICA'S physicians at Children's Hospital in Birmingham have transmitted documents concerning her condition to CHILTON COUNTY SCHOOLS. (Id., page 77, lines 14 through 23; page 78, lines 1 through 3).

MS. WRIGHT also testified that she recalled presenting DEFENDANT FINLAYSON (LITTLE JESSICA'S school principal in the 7th and 8th grades) with paperwork from Children's Hospital about JESSICA'S illness. (K. WRIGHT DEPO, page 83, lines 19 through 23; Id., page 84, lines 1 through 16).  LITTLE JESSICA'S mother has testified that she has made verbal requests to school officials seeking special services for LITTLE JESSICA even though she may or may not have used the "I.E.P." nomenclature (K. WRIGHT DEPO, page 105, lines 1 through 23; Id., page 106, lines 1 through 23; Id. page 107, lines 1 through 23; Id., page 108, lines 1 through 23).  Some of these requests were made to a MS. SANDERS whom MS. WRIGHT believes to be the special education coordinator for CHILTON COUNTY PUBLIC SCHOOLS. (K. WRIGHT DEPO, page 107, lines 1 through 23; Id., page 108, lines 1 through 23).  MS. WRIGHT describes her

conversation(s) with MS. SANDERS as follows: "Just when - - I would express that [JESSICA] was considered disabled, and she would be entitled to things such as the bathroom breaks . . . which she . . .had become scared to ask for.  I wanted her to eat during the day because the doctor said she had to.  Just any of the needs, she would have for particular days." (K. WRIGHT DEPO, page 109, lines 3 through 11).  MS. WRIGHT also discussed with MS. SANDERS LITTLE JESSICA'S digestive problems and the child's reactions to medications. (K. WRIGHT DEPO, page 110, lines 5 through 10).  She last spoke with Ms. SANDERS about JESSICA'S needs during the 2004-2005 academic school year. (Id., page 110, lines 11 through 14).

MS. WRIGHT further complained to DEFENDANT DONNIE FINLAYSON, JESSICA'S school principal in the 7th and 8th grades, about JESSICA'S illness: "I verbally told MR. FINLAYSON and handed him papers from the hospital on what JESSICA would need for the school year." (K. WRIGHT DEPO, page 111, lines 3 through 19).  MS. WRIGHT understood that a letter to school officials from her attorney in Birmingham constituted a request for a due process hearing. (Id., page 112, lines 9 through 14).  In or about the Fall of 2004 the child's mother reported to DEFENDANT FINLAYSON the incident where MR. BAKER would not allow LITTLE JESSICA to use the bathroom. (Id., page 114, lines 17 through 23; Id. page 115, lines 1 through 23).  KATHERINE WRIGHT also reported to DEFENDANT FINLAYSON about a MS. MITCHELL not allowing the child to use the restroom. (Id., page 116, lines 10 through 23).  MS. WRIGHT reiterated that she has spoken with DEFENDANT FINLAYSON at the beginning of each school year, gave him papers from the child's doctors, and tried to explain the matters contained therein. (K

-12-

WRIGHT DEPO, page 119, lines 12 through 23; Id., page 120, lines 1 through 6). The child's mother reiterated that she spoke to a MS. SANDERS, who she believed was the person at LITTLE JESSICA'S school who helped children with special needs, about getting help for LITTLE JESSICA. (Id., page 138, lines 1 through 23). MS. WRIGHT maintains that she has had multiple conversations with DEFENDANT FINLAYSON about LITTLE JESSICA'S special needs. (Id., page 139, lines 1 though 15). At the beginning of this school year, the 2005-2006 academic year, and after the filing of this lawsuit, the school system finally started to help LITTLE JESSICA. (K. WRIGHT DEPO, page 140, lines 1 through 23). An unknown representative from the central office came to the school and met with the principal, DEFENDANT DONNIE FINLAYSON, "to discuss special needs for Jessica." (Id.) The child's mother understood that a nurse has now been hired at LITTLE JESSICA'S school, subsequent to the filing of this lawsuit. (Id., page 142, lines 6 through 11). Also, subsequent to the filing of this lawsuit, the school district has now allowed LITTLE JESSICA to put snacks inside the classroom and to go to the restroom "often, frequent." (Id., page 142, lines 14 through 20). During the 2004-2005 academic school year MS. WRIGHT requested that a tudor be provided for LITTLE JESSICA to help her with make-up work when the child is released from each hospital stay. (Id., page 146, lines 4 through 23).

MS. WRIGHT also testified that she has made many complaints about LITTLE JESSICA'S special needs to DEFENDANT ANN GLASSCOCK, a member of THE CHILTON COUNTY BOARD OF EDUCATION, beginning in or about the 2004-2005 academic school year. (K. WRIGHT DEPO, page 148, lines 11 through 23: Id., page 149,

lines 1 through 23).  "We would just talk about how Jessica should be allowed to have bathroom breaks and eating.  And Ann was very understanding.  She always agreed that she understood Jessica was sick and she should be allowed to have whatever.  And with this lawsuit before it got filed - - I had told her we were filing this lawsuit because of these needs for Jessica. (Id.)  Sadly, DEFENDANT ANN GLASSCOCK never did anything to help the child. (K. WRIGHT DEPO, page 150, lines 8 and 9).  DEFENDANT GLASSCOCK went so far as to say that had her daughter been treated the way DEFENDANTS BAKER and FINLAYSON had treated LITTLE JESSICA then she, ANN GLASSCOCK, would have "clawed his eyes out." (Id., page 152, lines 1 through 10).  MS. WRIGHT testified that she did tell DEFENDANT ANN GLASSCOCK "what I wanted for [JESSICA].  And, you know, I am advised by her to bring stuff from the doctor to Mr. Finlayson, and I did do that.  I did get that each year and brought it to him as she told me to do." (Id., page 154, lines 15 through 20).  According to KATHERINE WRIGHT DEFENDANT ANN GLASSCOCK "disagrees with how things were handled [with] JESSICA [by the school district]." (Id., page 156, lines 4 through 15).  MS. WRIGHT has noticed that there are other students at little JESSICA'S school who appear to have disabilities and/or handicaps. (K. WRIGHT DEPO, page 158, lines 4 through 23; Id., page 159, lines 1 through 10).  JESSICA'S father also has had discussions with DEFENDANT ANN GLASSCOCK, including one at a local restaurant: "She gave us advice over months, you know, of trying to handle these problems." (B. WRIGHT DEPO, page 61, lines 2 through 3).

Way back during the 2003-2004 academic school year, when LITTLE JESSICA was in the sixth grade at the Clanton Middle School, PLAINTIFF KATHERINE WRIGHT told

-14-

one of JESSICA'S teachers, a MS. FINLAYSON, about all of the child's health problems. (K. WRIGHT DEPO, page 169, lines 1 through 23).   Despite MS. FINLAYSON'S assurances that "everything would be handled and taken care of just fine,"  LITTLE JESSICA was not allowed to eat snacks in class and she was not allowed to go to the bathroom "many times."  (K. WRIGHT DEPO, page 170, lines 1 through 23; page 171, lines 1 through 23; and page 172, lines 1 through 8).

JESSICA'S father testified that he went to meet with DEFENDANT FINLAYSON to complain after DEFENDANT BAKER would not let her go to the bathroom during the 2004-2005 academic school year. (B. WRIGHT DEPO, page 35, lines 5 through 21).  "I even called the hospital; was referred to either Kathy Baines or the social worker who said they would fax something down there that she [JESSICA] needed unrestricted, unasked - - that may not be a proper word - - access to the bathrooms, and the doctor signed it.  And MR. FINLAYSON in that meeting told me how he would handle it."  (Id., page 37. lines 15 through 23).  MR. WRIGHT also went to see DEFENDANT FINLAYSON after he learned of FINLAYSON'S "pity party" remarks to LITTLE JESSICA. (Complaint, pages 13 and 19; B. WRIGHT DEPO, page 55, lines 1 through 23).  MR. WRIGHT testified that he went to see FINLAYSON on that occasion to discuss LITTLE JESSICA'S needs but that FINLAYSON "just wanted to tell me all about his [own] son," (Id., page 57, lines 1 through 23).  MR. WRIGHT and DEFENDANT FINLAYSON discussed LITTLE JESSICA'S need for unrestricted access to the bathroom and her needing to carry a drink and snacks with her at all times. (Id., page 58, lines 17 through 21).  MR. WRIGHT was also emphatic that no one should make fun of LITTLE JESSICA. (Id.)  "I did request to MR. FINLAYSON that

-15-

*if JESSICA - - if there is anyway - - anything he could do to help her, you know, that we needed to do it or try to do it. I did do that. He assured me he would do everything he could to help us." (B. WRIGHT DEPO, page 62, lines 7 through 12). PLAINTIFF KATHERINE WRIGHT has served as a substitute teacher on a number of occasions at the school LITTLE JESSICA attends (J. WRIGHT DEPO, page 54, lines 3 through 23).*

*Several incidents illustrate the extent to which THE CHILTON COUNTY SCHOOL DISTRICT has been unresponsive to LITTLE JESSICA'S special needs; and moreover, on some occasions, representatives of the board have been downright hostile. On one occasion LITTLE JESSICA walked to a classroom where her mother, PLAINTIFF KATHERINE WRIGHT, was substitute teaching. (J. WRIGHT DEPO, page 55, lines 8 through 23). The child went to her mother's classroom because she was feeling sick and needed a snack. (Id., page 56, lines 6 through 12). The child had permission from her band teacher to go get the snack from her mother. (Id., page 56, lines 13 through 14). This occurred during the 2004-2005 academic school year when LITTLE JESSICA was in the seventh (7th) grade. (K. WRIGHT DEPO, page 128, lines 1 through 23). When DEFENDANT FINLAYSON found out about this he summoned LITTLE JESSICA to his office and gave her a savage tongue lashing: "[a]nd when I got there he started yelling at me. And he said that I was - - he said that I needed to stop all this pity party, and if I was going to act like a teaty baby, I just need to go home with my mama, and I need to stop using my sickness as a excuse to miss class." (J. WRIGHT DEPO, page 57, lines 2 through 8; PLAINTIFFS' COMPLAINT, page 19, paragraph no 52; K. WRIGHT DEPO, page 128, lines 1 through 23; Id., page 129, lines 1 through 23; PLAINTIFFS'*

COMPLAINT, page 13, paragraph no 26). *LITTLE JESSICA* testified that *DEFENDANT FINLAYSON'S* conduct "hurt my feelings really bad." (*J. WRIGHT DEPO*, page 55, lines 8 through 11). With respect to this incident *PLAINTIFF KATHERINE WRIGHT*, when asked about what happened, testified that she left her classroom looking for *JESSICA* because the office contacted her on the intercom about *LITTLE JESSICA'S* whereabouts. "I met her [JESSICA] coming down the hallway, just hysterical . . . MR. FINLAYSON walked up during the time I'm in the hall with *JESSICA* and proceeds to tell me that he does not want her using me as an excuse because I'm a substitute. And I was trying to explain to him that - - what it was, and he didn't want to hear it . . . [s]he wasn't using me as an excuse. She was sick all that day. She had been sick all that night before, and she was sick that day. (*K. WRIGHT DEPO*, page 131, lines 5 through 23). *See also*, J. WRIGHT DEPO, page 139, lines 17 through 23; *Id.*, lines 1 through 7.

The day before the "teaty-baby" incident in which *LITTLE JESSICA* was chastised by *DEFENDANT FINLAYSON* for going to get a snack from her mother, another incident occurred at the school which involved deliberate indifference to *LITTLE JESSICA'S* extraordinary need to go to the bathroom. (*J WRIGHT DEPO*, page 55, lines 19 through 23; *Id.*, page 56, lines 1 through 5). Toward the end of that particular school day *LITTLE JESSICA* was in a classroom under the supervision of *DEFENDANT DARYL BAKER* (*J. WRIGHT DEPO*, page 120, lines 4 through 22). While the class was still in session *LITTLE JESSICA* asked for permission to leave the classroom and go to the bathroom. (*Id.*) *DEFENDANT BAKER* refused to allow *LITTLE JESSICA* to go to the bathroom: "but when I asked him to go - - I can't hold it. And then I didn't want to go to the bathroom and - - if

*I didn't make it to the bathroom - - I didn't want to use it all in my clothes and then have to go outside and get in the car." (J. WRIGHT DEPO, page 121, lines 9 through 15). Incredibly, MR. BAKER then permitted another child in the classroom to go to the bathroom: "[b]ut before the bell rang, RACHAEL MIMS was, like, screaming, I've got to go to the bathroom, like she was really about to use the bathroom. And she's a real loud one. And she was like, I've got to go, I've got to go,I've got to go. And he said go." (J. WRIGHT DEPO, page 135, lines 13 through 21). LITTLE JESSICA, however, was not permitted by MR. BAKER to use the restroom. (Id.) Once class was over JESSICA went directly to her mother's automobile, without stopping at a school bathroom, because she was afraid she might defecate in her clothing. (J. WRIGHT DEPO, page 122, lines 1 through 17). The child testified that aside from this incident she was allowed to use the bathroom while she was student in Mr. BAKER'S class "most of the time." (Id., page 123, lines 4 through 7).*

*On still another occasion during her seventh grade year the child was not allowed by her physical education teacher , MS. MITCHELL, to go to the bathroom. (J. WRIGHT DEPO, page 124, lines 1 through 23, Id., page 125 lines 1 through 8). This was in a physical education class under the supervision of a MS. MITCHELL. (J. WRIGHT DEPO, page 124, lines through 1 through 23). LITTLE JESSICA had been experiencing stomach cramps all day and, when she requested permission to go to the restroom, MS. MITCHELL replied, "this ain't a time to rest." (Id., page 124, lines 1 through 23; page 125, lines 1 through 5). This is the same MS. MITCHELL who once visited LITTLE JESSICA during one of her hospital stays. (Id.) MS. MITCHELL was the cheerleader sponsor. (J. WRIGHT DEPO, page 126, lines 3 through 5). During this hospital visit MS. MITCHELL sternly*

-18-

warned LITTLE JESSICA that she might not be selected to be on the cheerleading team during the upcoming tryouts for the 2005-2006 academic school year: "Well, she was sitting there, and she may have been just saying this, but it - - she probably shouldn't have told me it. She said - - she looked at me straight in the eyes, and she said if there - - and she did her little finger (indicating), she said, if you was to not make cheerleader this year, you need to go out for dance team to keep your health up." (J. WRIGHT DEPO, page 129, lines 4 through 12). LITTLE JESSICA testified that this " . . . just kind of bothered me and put it in my head." (*Id.*, page 129, lines 1 and 2). This occurred during the spring of 2005, approximately two (2) to three (3) weeks before the scheduled tryouts to select cheerleaders for the upcoming 2005-2006 academic school year. (J. WRIGHT DEPO, page 129, lines 19 through 23; *Id.*, page 131, lines 18 through 21).

Another incident of some significance occurred when LITTLE JESSICA returned to school after missing a day to have a new intravenous portal surgically implanted in her side to facilitate direct injections of her various medications. (J. WRIGHT DEPO, page 150, lines 4 through 23; *Id.*, page 151, lines 1 though 21). LITTLE JESSICA had the surgery one day and then returned to school the following day: "And I was walking through the lunchroom, and he [DEFENDANT FINLAYSON] called me over there, and he said, did you have surgery yesterday? And I said, yes sir. He goes wow! I haven't known of anybody having surgery one day and back to school the next. I don't know if he was meaning he was glad I came back to school or calling me a *liar*." (J. WRIGHT DEPO, page 152, lines 5 through 14). LITTLE JESSICA was embarrassed by these remarks which occurred in the presence of other teachers. (*Id.*, page 152, lines 15 through 23).

LITTLE JESSICA'S mistreatment at her school is not limited to the classroom setting. Office personnel at the school have sometimes refused to allow LITTLE JESSICA to use the telephone to call her mother when she was sick. (J. WRIGHT DEPO, page 61, lines 15 through 19). Office personnel would "scream" at her when LITTLE JESSICA wanted to use the phone. (*Id.*) On one occasion LITTLE JESSICA went to the school office to obtain and take her noon meal medication. Because office personnel were absent LITTLE JESSICA had to wait on them to return and, consequently, missed her lunch in the school cafeteria. (J. WRIGHT DEPO, page 69, lines 10 through 17). LITTLE JESSICA'S mother had to be called to bring lunch to the child. (*Id.*) On yet another occasion an office worker named MS. JOHNSON refused to allow LITTLE JESSICA to use the telephone to call her mother without first paying twenty-five cents for the call. (J. WRIGHT DEPO, page 148 lines 21 through 23; *Id.*, page 149, lines 1 through 10). The child needed to use the telephone to call her mother to bring some money to the school for her to have snacks: ". . . I didn't have no snack money. And I asked her if I could call home, and she started yelling at me, why don't you just bring it." (J. WRIGHT DEPO, page 148, lines 2 through 7). "She (MS. JOHNSON) said something like, you should bring it when you are here, and stuff like that . . . she just embarrassed me." (*Id.*, page 148, lines 12 through 16). LITTLE JESSICA did not have a quarter with her and was thus not allowed by MS. JOHNSON to use the telephone. (*Id.*, page 149, lines 4 through 10). The child went hungry at school and had to wait until she got home to eat. (*Id.*) MS. JOHNSON'S maltreatment of LITTLE JESSICA, a terminally ill child with cystic fibrosis, would become eventually become even more egregious. LITTLE JESSICA went to the school office on one occasion to obtain and

her medication which was being kept in the office.  "MS. JOHNSON dropped [the pills] on

the floor and picked them back up. blew them off, and handed them to me."  (J. WRIGHT

DEPO, page 156, lines 2 through 9).  MS. JOHNSON refused to wipe the pills off and she

failed and/or refused to dispense the child some uncontaminated pills. (<u>Id</u>.)

### D.    <u>Damages</u>

MR. WRIGHT testified about the impact all of this has had upon LITTLE JESSICA

and the WRIGHT FAMILY.  LITTLE JESSICA'S self-confidence and belief in herself has

been "destroyed." (B. WRIGHT DEPO, page 47, lines 1 through 9).  LITTLE JESSICA has

been changed into a "negative pessimistic person." (<u>Id</u>.)  PLAINTIFF BENNY WRIGHT

testified about how the school district's treatment of LITTLE JESSICA had upset him: "I get

depressed and emotional when I - - you know, about this situation, and I just really - - I

thought it would be better that I just stayed away.  I've had a couple of meetings with MR.

FINLAYSON during the seventh grade, and it's just better that I stayed away, and I did."

(BENNY WRIGHT DEPO, page 34, lines 5 through 11).  MR. WRIGHT testified that it hurts

him deeply when LITTLE JESSICA comes home from school, upset and crying, after

someone has mistreated her at school. (B. WRIGHT DEPO, page 72, lines 1 through 9).

After these incidents occur the parents often have difficulty getting LITTLE JESSICA up

to go to school the next morning. (<u>Id</u>.)  "I mean it hurts you," he said.  "I just worry about

her being mistreated at school.  I worry about what they are going to do next." (<u>Id</u>., lines

1 through 20).  LITTLE JESSICA continues to have problems at school even after the

meetings that both MR. WRIGHT and MRS. WRIGHT have had with DEFENDANT

FINLAYSON: "If she needed to go to the restroom and somebody wouldn't let her go to the restroom right now, her stomach would cramp up until she released gas. And it's the most smelly gas you can think of, and her classmates make fun of her . . ." (B. WRIGHT DEPO, page 75, lines 10 through 15).    JESSICA'S father characterized a letter previously sent to the school board's attorney as a "plea to the - - to the superintendent to please do something about this situation." (B. WRIGHT DEPO, page 74, lines 1 through 3).    The impact of all of this upon LITTLE JESSICA has been significant: "JESSICA, as I described earlier, used to be so enthusiastic and have confidence so in herself that she could do anything, and she's completely turned around now. She does not believe in herself. She to a sense has sort of just went into her little shell. She stays in her room a lot by herself. She doesn't believe in people to talk to them anymore to take care of her problems because she just don't think anybody can help when she has a problem. It's just completely changed her, this situation has." (Id., page 73, lines 2 through 14).

The extent of LITTLE JESSICA'S emotional trauma was also attested to by the child's mother: "[S]he's been made fun of at school . . . [b]ut she's came home crying before about different remarks." (K. WRIGHT DEPO, page 176, lines 2 through 5). The child weeps because "[t]here would be something happen at school that day, someone saying something, or she's be hurting because - - she's not the same." (Id., lines 6 through 23). LITTLE JESSICA herself testified, "I'm just so self-conscious about what's going on around me, like who's talking about me," (J. WRIGHT DEPO, page 47, lines 7 through 9), and that she cries a lot when she gets home [from school] - - "I just ball." (Id., page 158, lines 10 through 11). The child testified that the drop in her self-esteem is because of the

way she has been treated as school by the teachers and by DEFENDANT FINLAYSON. (*Id.*, page 157, lines 1 through 8).

### SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of The Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file together with affidavits if any show there is no genuine issue as to any material fact and that the moving parties are entitled to a judgment as a matter of law." **Celotex Corporation v. Catrett**, 447 U.S. 317, 322 (1986); **Everett v. Napper**, 833 F.2d 1507, 1510 (11th Cir. 1987). A party is entitled to judgment as a matter of law unless the non-movant demonstrates that a genuine dispute exists as to an element of his or her case on which they have the burden of proof. **Celotex**, 477 U.S. at 322. The function of the court is not to weigh the evidence and determine the truth of the matter but to determine whether there is an issue for trial. **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 249 (1986). Summary Judgment is improper "if the dispute about a material fact is genuine; that is if the evidence is such that a reasonable jury would return a verdict for the non-moving party." *Id.* at 248. If a reasonable fact-finder can find more than one inference from facts and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgement. **Samples v. City of Atlanta**, 846 F.2d 1328, 1330 (11th Cir. 1980). All of the factual matters are to be viewed in the light most favorable to the non-moving party. **Barnes v. Southwest Forest Industries, Inc.**, 814 F. 2d 607, 609 (11th Cir. 1987).

-23-

### *ARGUMENT*

**I.    *DEFENDANTS' ARGUMENT THAT PLAINTIFFS HAVE FAILED TO EXHAUST THEIR ADMINISTRATIVE REMEDIES IS SPECIOUS BUT IT MUST FAIL BECAUSE IT DOES NOT ADDRESS THE LEGALLY RECOGNIZED EXCEPTIONS.***

*The DEFENDANTS contend that PLAINTIFFS have failed to exhaust their administrative remedies and that they are entitled to summary judgment as to Counts 1 and 2 of the complaint, which allege violations of the I.D.E.A..  The gist of their argument is that this Court lacks subject matter jurisdiction, under both I.D.E.A. and 42 U.S.C. Section 1983, because of PLAINTIFFS' failure to exhaust administrative remedies.  We submit that this argument  is specious but it is due to fail because it does not address the various legally recognized exceptions to the exhaustion of administrative remedies rule. See, e.g. **Honig v. Doe**, 108 S. Ct. 592, 484 U.S. 305, 98 L.Ed. 2d 686 (1988).*

*Ordinarily state administrative procedures must be exhausted before a judicial action under I.D.E.A. may be commenced.   20 U.S.C.A. § 1415(i)(2)(1); **Dubois v. Connecticut State Board of Education**, 727 F. 2d 44 (2nd Cir. 1984); **Donoho ex rel. Kemp v. Smith County Board of Education**, 21 Fed. Appendix 293 (6th Cir: 2001).  However, failure to exhaust administrative remedies may be excused where it would be futile to use the procedures, where the agency has adopted a policy or pursued a practice that it is contrary to law, or where it is improbable that adequate relief could be obtained by pursuing administrative remedies.  **Schlude v. Northeast Central School District**, 892 F. Supp. 560 (S.D.N.Y. 1995); **M.M ex rel. D.M. v. School District of Greenville County**, 303 F. 3d 523 (4th Cir: 2002).  Therein it was explicitly held that:*

-24-

> "It is clear that, under the IDEA, parents asserting a
> violation of the IDEA must first request a due process
> hearing. 20 U.S.C. § 1415(f).    The courts have
> recognized only three narrow exceptions to this
> exhaustion requirement, each arising largely out of the
> legislative history of the IDEA: (1) when the
> administrative process would have been futile; (2) when
> a school board failed to give parents proper notification
> of their administrative rights; or (3) when administrative
> exhaustion would have worked severe harm upon a
> disabled child. See, e.g., **Hoeft v. Tucson Unified Sch.
> Dist.**, 967 F. 2d 1298, 1303-04 (9th Cir. 1992); **Koster
> v. Frederick County Bd. of Educ.**, 921 F. Supp. 1453,
> 1455 (D. Md 1996)."

303 F. 3d at 536.  See also, **Birmingham v. Omaha**, 220 F. 3d 850 (8th Cir: 2000)(a

plaintiff may bring a claim under I.D.E.A. where exhaustion of administrative remedies

would be futile).  The PLAINTIFFS' complaint clearly satisfies all of the elements necessary

to state a claim under I.D.E.A.  At paragraphs 23, 24 and 25 of the complaint PLAINTIFFS

allege that the DEFENDANTS have refused to provide JESSICA, a disabled child, with an

appropriate and fully integrated public education as required by I.D.E.A..  Therein we

complain that the DEFENDANTS have failed and refused to plan and develop an Individual

Education Plan for JESSICA as required by I.D.E.A.  At paragraph 24 of the complaint we

specify with particularly the special services and accommodations which a child with C.F.

should receive pursuant to an I.E.P.   At paragraph 30 we aver that the DEFENDANTS

refusal to comply with I.D.E.A. has had the effect of denying little JESSICA access to the

educational opportunities provided by her school and/or the benefits of the educational

programs operated by the Board.   At paragraph 25 we aver that the child's parents have

asked CHILTON COUNTY SCHOOL OFFICIALS to comply with I.D.E.A. by planning and

implementing an I.E.P. for little JESSICA.  Not only have the officials refused but in  doing

so some of them have uttered insults at a little girl who is dying from cystic fibrosis.  _See_,

_e.g._ paragraph 25 of the complaint.  Clearly then it would be futile for PLAINTIFFS to

continue to make requests to school officials for administrative relief under these facts and

circumstances.  Moreover, the exhaustion requirement is not jurisdictional and therefore

is not to be applied inflexibly.  **_Ass'n for Retarded Citizens of Alabama v. Teague_**, 830

F. 2d 158 (11th Cir: 1987).

Based on the foregoing, it is abundantly clear that in this matter exhaustion of

administrative remedies is not required because it would be futile and woefully inadequate

to protect Jessica's rights.  Moreover, PLAINTIFFS' cannot exhaust administrative

remedies when the DEFENDANTS refuse to even perform their own administrative

functions under I.D.E.A.  In addition thereto, exhaustion should not be required because

PLAINTIFFS were not given full notice of their procedural rights under I.D.E.A.

## II. **_DEFENDANTS' ARGUMENT THAT CLAIMS UNDER I.D.E.A. CANNOT BE BROUGHT AGAINST INDIVIDUAL DEFENDANTS MUST FAIL AS UNSOUND AND UNSUPPORTED._**

DEFENDANTS contend that PLAINTIFFS' I.D.E.A. claims against the individual

school board members and officials fail to state a claim against those DEFENDANTS upon

which relief can be granted, and that the I.D.E.A. claims against those individuals are due

to be dismissed.  We submit that this argument is due to fail as unsound and unsupported.

Under the I.D.E.A. a court may grant any relief that the court deems appropriate.

20 U.S.A. § 1451(e)(2).  This relief may include an award of attorney fees, an award of

costs, punitive damages, and injunctive relief.  20 U.S.C.A. § 1451(e)(4)(B);  **_Bailey v. District of Columbia_**, 839 F. Supp 888 (D.C. Dist. Col: 1993); and **_Mason by and Through Mason v. Schenectady City School District_**, 879 F. Sup 215 (D.C. New York 1993).  Other remedies include reimbursement to parents for private school placement or out-of-pocket expenses, payment of compensatory education, civil liability against the offending state, and loss of federal assistance to the offending state.  **_School Committee of Burlington v. Department of Education_**, 471 U.S. 359, 85 L. Ed 2d 385, 105 S. Ct. 1996 (1985); **_Jefferson County Bd. of Education v. Breen_**, 853 F 2d 853, <u>rehearing denied en banc</u>, 864 F. 2d 795 (11th Cir: 1988); **_Murphy v. Timberlane Regional School District_**, 22 F. 3d 1186 (First Cir: 1994) and **_Wirta v. District of Columbia_** 859 F. Supp 1 (D.C. Dist. Co: 1994).

Since 1986, the Individuals with Disabilities Act (IDEA), which generally provides that all children with disabilities have a right to a free appropriate public education, has contained a non-exclusivity provision.  This provision states that the I.D.E.A. is not to be construed so as to restrict or limit the rights, procedures, and remedies available under other Federal statutes protecting the rights of children and youth with disabilities.   20 U.S.C.A. § 1415(b)(2)(c) and § 1415(f).  Thus, an action may be brought under 42 U.S.C. § 1983 to enforce I.D.E.A. rights, and the District Court has discretion to fashion an appropriate remedy, including monetary damages and compensatory education.  **_W.B. v. Matula_**, 67 F. 3d 484 (3rd Cir: 1995); **_Crocker v. Tennessee Secondary Sch. Athletic Ass'n_**, 980 F, 2d 382 (6th Cir: 1992).  In additional thereto, we allege that the collective DEFENDANTS, and each of them, have all acted in bad faith with respect to their violations

*of the I.D.E.A.*

**III.    DEFENDANTS' ARGUMENT THAT THEY ARE ENTITLED
TO SUMMARY JUDGMENT AS TO OUR CLAIMS
BROUGHT UNDER SECTION 1983 IS WITHOUT
SUBSTANCE AND IT IS DUE TO FAIL AS A MATTER OF
LAW.**

*DEFENDANTS argue that an action brought pursuant 42 U.S.C. Section 1983 is
unavailable for PLAINTIFFS' claims under I.D.E.A.    DEFENDANTS contend that
PLAINTIFFS are attempting to circumvent the requirement of exhaustion of administrative
procedures provided for in the I.D.E.A.  We submit that this argument is without substance
and it is due to fail as a matter of law.*

*The language of I.D.E.A. itself makes it abundantly clear that the act does not
provide the exclusive avenue for redress available to children with disabilities.  20 U.S.C.A.
§ 1415(f).  § 504 of the Rehabilitation Act, 29 U.S.C.A. § 794, as well as 42 U.S.C. Section
1983, may be used to enforce I.D.E.A. educational rights.  Thus, an action may be brought
under 42 U.S.C. Section 1983 to enforce I.D.E.A. rights, and the District Court has
discretion to fashion an appropriate remedy, including monetary damages and
compensatory education.  **W.B. v. Matula**, supra. See also, **McCachren v. Blacklick
Valley School District**, 217 F. Supp. 2d 594 (W.D. Pa 2002)(held that high school
students and their parents could bring Section 1983 action seeking compensatory and
punitive damages for alleged violations of I.D.E.A. without first exhausting administrative
remedies, the exhaustion requirement applying only to requests for relief other than
damages); **Vultaggio ex rel. Vultaggio v. Bd. of Educ. of Smithtown Central School***

*Dist.*, 216 F. Supp. 2d 96 (E.D. NY 2002)(retaliation claims against school officials available under I.D.E.A. may be brought under Section 1983); *Eddins v. Excelsior Indep. School Dist.*, 88 F. Supp. 2d 695 (E.D. Texas 2000)(Section 1983 may be used to enforce federal substantive rights that are established in a favorable I.D.E.A. administrative decision when the statute or state law lacks a specific enforcement provision); *A.A. v. Bd of Educ. of Central Islip Union Free School Dist.*, 255 F. Supp. 2d 119 (E.D. NY 2003)(a plaintiff may enforce I.D.E.A. rights granted by way of action brought pursuant to Section 1983); and *Birmingham v. Omaha School Dist.*, 220 F. 3d 850 (8th Cir: 2000)(a Section 1983 complaint seeking damages, reasonable attorney's fees, costs, and "any other relief that the Court deems just and proper" for alleged I.D.E.A. violations did in fact state a claim upon which relief could be granted).

We would submit that our complaint satisfies all of the necessary elements to sustain a claim under 42 U.S.C.S. Section 1983. At paragraphs 42, 43, 44, and 45 of the complaint the PLAINTIFFS have pled with particularity that little JESSICA'S rights to personal safety, security, privacy and health, as guaranteed to her by I.D.E.A. based upon the due process clause and equal protection clause of the Fourteenth Amendment, as it is enforced under 42 U.S.C. Section 1983, have been violated by the educator defendants. By refusing to implement an I.E.P. for JESSICA the DEFENDANTS are depriving her of her I.D.E.A. rights without first affording her due process of law. The DEFENDANTS are also violating little JESSICA'S equal protection rights because there are other handicapped children in the CHILTON COUNTY SCHOOL SYSTEM who are receiving benefits and services under the I.D.E.A. at the same time that those benefits and services are being

denied to JESSICA.  The term "disparate treatment" clearly applies to our equal protection claim.  Moreover, and for purposes of "official policy" liability under Section 1983, we have made specific allegations that one or more of the individual educator DEFENDANTS, as official policymakers, have been aware of the deprivation(s) of JESSICA'S Fourteenth Amendment rights but failed to stop them.  See, e.g., paragraphs 8 through 17 and paragraphs 43, 44, and 45 of the complaint.  In the decision of **_Monell v. Dept. of Social Services_**, 436 U.S. 658 (1978), the Supreme Court held that "[i]n order to state a claim under § 1983 against a local governing body, a plaintiff must allege that she suffered a constitutional injury, and that her injury was caused by "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers."  _See_, **_Monell_**, 436 U.S. at 690.  Therefore, a local government may be held liable under § 1983 only for acts for which it is actually responsible, "acts which the [local government] has officially sanctioned or ordered."  _See_, **_Pembaur v. City of Cincinnati_**, 475 U.S. 469, 479-80 (1986).  The PLAINTIFFS make these allegations at paragraphs 8 through 17 and paragraphs 43, 44, and 45 of the complaint.

IV.    **_PLAINTIFFS' CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ARE NOT REDUNDANT OF THEIR CLAIMS AGAINST THE CHILTON COUNTY B.O.E. BECAUSE THOSE DEFENDANTS ARE LIABLE FOR DAMAGES, IF AT ALL, ONLY IN THEIR INDIVIDUAL CAPACITIES._**

DEFENDANTS next contend that PLAINTIFFS' claims against the individual educator defendants are due to be dismissed because those claims are redundant of the claims which have been brought against The Chilton County Board of Education.   We

disagree.  Since claims for punitive damages may not be asserted against a government entity or an individual sued in their official capacity, our claims for punitive damages can only be assessed if the educator defendants can be held liable in their individual capacities.  **City of Newport v. Fact Concerts**, 453 U.S. 247 (1981) The individual educator DEFENDANTS imply that they are immune from suit under the doctrine of qualified immunity.

Qualified immunity was first enunciated in **Harlowe v. Fitzgerald**, 457 U.S. 800, 815-19 (1982).  Under **Harlowe**, an official who was performing a discretionary function was entitled to qualified immunity if his conduct did not violate "a clearly established constitutional or statutory right of which a reasonable person would have known."  **Harlowe** at 818.  In **Anderson v. Creighton**, 483 U.S. 635 (1987), the Court indicated that the "contours" of the asserted constitutional or statutory right must be sufficiently clear to give an official notice that his or her conduct was unlawful.  The applicability of qualified immunity in a particular case is a question of law to be properly decided by the Court.  **Mitchell v. Forsythe**, 472 U.S. 511 (1985).  Qualified immunity is designed to protect all but the plainly incompetent or those who knowingly violate the law.  **Malley v. Briggs**, 475 U.S. 335 (1986).

In **Lassiter v. Alabama A&M University**, 28 F. 3d 1146 (Cir. 1994)(en banc), the Eleventh Circuit Court of Appeals discussed the guiding principles of qualified immunity.  In discussing these guiding principles, the Court discussed the basic question of when is a law "clearly established."  The Court held that for a law to be clearly established to the point that qualified immunity would not apply, the law must have been developed in such

*a concrete and factually defined context as to make it obvious to all reasonable government actors that what is being done violates federal law.* **__Lassiter__** *at 1149. Importantly, the Court discussed the need that the law be clearly established on the definite point so that qualified immunity would not apply, basing this need on the fact that qualified immunity usually protects government actors sued in their individual capacities. Only in exceptional cases are government officials not protected against claims against them made in their individual capacities. Id at 1149. We respectfully submit that the matter at bar constitutes one of those exceptional cases.*

*The tenet of sufficient clarity has been further elucidated by the Court of Appeals. Determining whether the PLAINTIFF has proven this clearly established requirement, the Court must make a determination whether a violation of a clearly established constitutional right has been alleged employing a fact-specific inquiry to ascertain whether "there existed sufficient case law establishing the contours of [PLAINTIFF'S] constitutional rights such that the unlawfulness of the DEFENDANT'S conduct would have been apparent to a reasonable official in the same circumstances . . . if no such case law exists, then the DEFENDANT in entitled to qualified immunity."* **__Belcher v. City of Foley__**, *30 F. 3d 1390, 1395 (11th Cir 1994)(internal citations omitted). This brief cites a plethora of judicial decisions which clearly establish the DEFENDANTS' obligations to Jessica under the I.D.E.A. Moreover, the Chilton County Board of Education is well aware of it's duties under the I.D.E.A. because it has been found guilty of breaching those duties in the past. See, e.g.,* **__Doucet v. Chilton Co. Board of Educ.__**, __supra__.

*We submit that the issues raised by the dismissal motion with respect to qualified*

-32-

immunity are best addressed on a summary judgment motion and any consideration thereof at this point should be pretermitted until the discovery process is completed.

> ### V. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFFS' CLAIM FOR THE TORT OUTRAGE BECAUSE THERE EXISTS A QUESTION OF MATERIAL FACT AS TO SAME.

DEFENDANTS contend that the tort of outrage is not a cognizable claim under the facts of this case and that the elements of the tort of outrage are not satisfied by the allegations in the PLAINTIFFS' complaint. We submit that there is a genuine issue of material fact as to whether or not the acts of the individual DEFENDANTS satisfy the required elements of the tort of outrage.

The elements of the action for outrage may be succinctly stated as follows:

> "(1) That the actor intended to inflict emotional distress or should have known that it would result; (2) that the conduct was extreme and outrageous; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress of the plaintiff was severe."

*U.S.A. Oil v. Smith*, 415 So. 2d 1098 (1982). The wrong is the doing of some act that is so traumatic that it causes a physical or personal injury to another. *Id*. The tort may be stated thusly: it is the intentional infliction of emotional distress. *Vincent v. Blue Cross*, 33 So. 2d 1054 (1979). The tort will lie where an employer has treated the employee with conduct of an extreme nature which causes emotional distress that no reasonable person can be expected to endure. *American Road v. Inmon*. 394 So. 2d 361 (Ala. 1981); *Rice v. United Insurance Co. of America*, 465 So. 2d 1100 (1984). It is axiomatic that the tort

of outrage requires proof of conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. (*Id*.)        In the complaint in the matter at bar PLAINTIFFS clearly and unambiguously state that they have suffered emotional distress. It is therefore a question of fact for the jury to determine whether the conduct and actions of the DEFENDANTS rise to the level of outrage, and whether the emotional distress suffered by the PLAINTIFFS was so extreme that no reasonable person could be expected to endure it.   Again, the appropriate DEFENDANTS are liable for monetary damages, if any are awarded at all, only if they are sued in their individual capacities.

Our outrage claim is predicated in part upon certain verbal harassment visited upon little JESSICA and her mother by DEFENDANTS ELLISON and FINLAYSON.   This includes  but is not limited to the following:  (i) DEFENDANT FINLAYSON'S statement to JESSICA (a terminally ill child) that "if you are going to be sick all the time, and you are going to be such a 'teaty baby' you need to stay at home; (ii) DEFENDANT FINLAYSON'S statement  to JESSICA (a terminally ill child) that, "I am tired of you using your illness as an excuse to miss class;" and (iii) DEFENDANT FINLAYSON'S statement to PLAINTIFF KATHERINE WRIGHT that, "just because you are a substitute teacher, I do not want her [JESSICA] taking advantage of that and missing class just to hang around with you." See e.g. paragraph 52 of the PLAINTIFFS' complaint.  It is difficult for this writer to perceive any more compelling set of circumstances which would have the potential to cause someone extreme emotional distress which no reasonable person could be expected to endure.  We submit, therefore, that the PLAINTIFFS' outrage claims give rise to a genuine issue of

*material fact which is due to be resolved by the jury.*

### VI.    DEFENDANTS' PREVIOUSLY ASSERTED ARGUMENT THAT PLAINTIFFS' STATE-LAW TORT CLAIMS ARE BETTER SUITED FOR STATE COURT CONSTITUTES A BLATANT ATTEMPT AT FORUM SHOPPING.

*We submit that there is no legal basis for DEFENDANTS' previously asserted argument that PLAINTIFFS' state-law tort claims should be litigated in state court instead of the United States District Court.  In fact, the argument borders on an attempt at forum shopping.  Counts One and Two of the complaint, brought pursuant to 20 U.S.C.S. § 1400 et seq. and 42 U.S.C. Section 1983, undeniably create a basis for Federal jurisdiction because they arise under the Constitution and laws of The United States.  The remaining counts of the complaint are brought under the pendent and supplemental jurisdiction of the Court.  Therein, PLAINTIFFS seek to hold DEFENDANTS liable under State law for various acts and omissions of the DEFENDANTS which arise out of the same nucleus of operative facts as PLAINTIFFS' Federal claims.  PLAINTIFFS should not be required to litigate their state-law tort claims in state court while at the same time they are litigating the same factual and legal issues in a proceeding in the U.S. District Court.  This could lead to inconsistent results and conflicting determinations of law.  All claims of law and fact arising out of the same transaction should be settled in one proceeding.  Moreover, what is being proposed by the DEFENDANTS would be violative of § 6-5-440, Code of Alabama 1975, which provides that "[n]o plaintiff is entitled to prosecute two actions in the courts of this state at the same time for the same cause and against the same party.  In such a case the defendant may require the plaintiff to elect which he will prosecute . . ."  It has been*

explicitly held that the term "courts of this state" as used in Section 6-5-440 includes the United States District Courts in Alabama. **Terrell v. Bessemer**, 406 So. 2d 337 (Ala. 1981).

VII. **SUMMARY JUDGMENT IS INAPPROPRIATE AS TO PLAINTIFFS' STATE LAW CLAIMS BROUGHT AGAINST THE INDIVIDUAL DEFENDANTS BECAUSE A PERSON'S MERE STATUS AS A STATE OFFICIAL DOES NOT AUTOMATICALLY CLOAK HIM OR HER WITH THE STATE'S SOVEREIGN IMMUNITY.**

It is axiomatic that a defendant's mere status as a state official or public employee does not automatically cloak him or her with the state's constitutional immunity. **Phillips v. Thomas**, 555 So. 2d 81 (Ala. 1989). Moreover, the applicability of the doctrine of discretionary function immunity to a government employee's sovereign immunity claim must be determined on a case-by-case basis, and it is a question of law to be decided by the trial court. **Ryans v. Hayes**, 831 So. 2d 21 (Ala. 2002). For the reasons set forth hereinbelow we submit that the DEFENDANTS' Motion(s) to Dismiss are due to be denied. The essence of our argument is that the DEFENDANTS have all acted illegally, fraudulently, in bad faith, beyond the scope of their authority, or under a mistaken interpretation of law. DEFENDANTS are therefore not immune from suit because their misconduct falls under one or more of these recognized exceptions to the doctrine(s) of immunity as discussed hereinbelow.

Article I, Section 14, Constitution of Alabama of 1901, provides that "the State of Alabama shall never be made a defendant in any court of law or equity." It is thus axiomatic that the State and it's agencies have absolute immunity from suit in any court

under this provision. **_Barnes v. Dale_**, 530 So. 2d 770 (Ala. 1988).    State officers and

employees, in their official capacities and individually, are absolutely immune from suit when

the action is, in effect, one against the State. **_Barnes_**, _id_.    It is singular to note, however,

that no state officer or employee can escape individual tort liability by arguing that his "mere

status as a state official cloaks him with the state's constitutional immunity." **_Phillips_**, 555

So. 2d at 83.    A state employee is not protected by Article I, Section 14 when he acts

"willfully, maliciously, illegally, fraudulently, in bad faith, beyond his authority**,** or under a

mistaken interpretation of law." _Id_.    In the case at bar, the dispositive issues concerning

sovereign immunity are: (1) whether the **PLAINTIFFS**' claims against the  **DEFENDANTS**

are in effect, claims against the State and, if not, (2) whether any of the **DEFENDANTS** are

entitled to sovereign immunity because they were engaged in the exercise of a discretionary

public function.  To determine whether the action is, in effect, one against the State, a court

must consider such factors as the nature of the action and the relief sought.    **_Phillips_**,

_supra_, 555 So. 2d at 81.    Article I, Section 14 prohibits suits against state officers and

employees in their official capacity when a result favorable to the plaintiff would directly

affect a contract or property right of the State. **_Milton v. Espey_**, 356 So. 2d 1202 (Ala.

1978).  We submit that an action for negligent/wanton supervision by supervisory officials

of their subordinate employees is not within the ambit of Section 14 protection.  Such a

claim, by virtue of it's nature and the relief demanded, in no way seeks to circumvent the

prohibition of Section 14. _See_, **_DeStafney v. University of Alabama_**, 413 So. 2d 391, 395

(Ala. 1981) (personal injury action against individual state employees not within the

protection of Section 14); **_Ryans v. Hayes_**, _supra_ (state prison officials and prison guards

-37-

liable for negligence/wantonness as well as negligent/wanton supervision for injuries inflicted upon citizens by escaped inmates); and **Ex Parte Cranman**, *supra* (University of Alabama school physicians not entitled to Section 14 immunity for failing to correctly diagnose testicular cancer of **PLAINTIFF'S** decedent.)

Applying the holdings of several of the Alabama Supreme Court's recent decisions involving questions of the application of immunity for governmental officials and public employees, **Ryans v. Hayes**, *supra*, the **DEFENDANTS**' Motion for Summary Judgment in the matter at bar which is based in large part upon assertions of immunity is due to be denied. In the instant case **PLAINTIFFS** have specifically pleaded in their complaint that the **DEFENDANTS** have breached one or more duties which they owed to the **PLAINTIFFS** under Alabama law.    Moreover, **PLAINTIFFS** have alleged in their complaint that in committing this tortuous misconduct the **DEFENDANTS** have acted illegally and in bad faith.    Indeed, the law in Alabama is quite clear that where such allegations are specifically pleaded a governmental defendant is not automatically protected from liability by the doctrine of sovereign immunity. **Donahoo v. State**, 479 So.2d 1188 (Ala. 1985).

In the case of **Ryans v. Hayes**, *supra*, the plaintiffs were individuals who were victimized and injured by a state prison inmate who had escaped from a prison chain gang group which was working outside the prison. They filed suit against the prison warden and other prison officials charging various acts and omissions which constituted negligence and wantonness.   The gist of the **PLAINTIFFS**' theories of recovery was that prison officials were negligent and wanton, based upon the inmate's violent history, in assigning the inmate to a chain gang which would be working outside of the prison.   There was also evidence

-38-

that prior to the escape a prison official had changed the inmate's status, making him ineligible for assignment to an outside work crew, but that the paperwork regarding that change in status somehow did not reach the appropriate official before the inmate was dispatched outside of the prison to work on the chain gang. **PLAINTIFFS** also charged that the individual prison guard who was responsible for watching the inmates on the chain gang was negligent and wanton in permitting him to escape. Summary judgment(s) were granted in favor of the prison officials based upon their claims of sovereign immunity (which encompasses discretionary function immunity) and based upon their claims that they owed no duty to the victim **PLAINTIFFS**. The **PLAINTIFFS** appealed and the Alabama Supreme Court reversed and remanded the case.

Suffice it to say that the following portion of The Alabama Supreme Court's holding in **Ryans v. Hayes**, supra, conclusively establishes that **DEFENDANTS**' Motion to Dismiss in the matter at bar is not well taken:

> "'[A] State officer or employee is not protected by discretionary immunity if in performing his discretionary functions he willfully, maliciously, fraudulently, or in bad faith injures someone. [Nonetheless,] [o]nce a defendant demonstrates that a plaintiff's claims arise from the defendant's performance of a discretionary function [i.e., a function now entitling the defendant to State-agent immunity], the burden then shifts to the plaintiff to establish that the defendant acted in bad faith or with malice or willfulness, in order to deny the defendant discretionary immunity from suit. The applicability of the doctrine of discretionary function must be determined on a case-by-case basis, and it is a question of law to be decided by the trial court.'"

831 So. 2d at 25; quoting, **Ex Parte Davis**, 721 So. 2d 685, 689 (Ala. 1998). The majority

opinion in **_Ryans v. Hayes_**, _supra_, holds that the issues of sovereign immunity, discretionary function immunity, and qualified immunity, as well as the issue of whether or not a duty is owed to the **PLAINTIFF**, are not ripe for review by the trial court until extensive discovery is conducted. This is because a "burden shifting" process is now used to definitively resolve the effect of an asserted State-agent-immunity defense upon a plaintiffs' claim:

> "In order to claim the benefits of sovereign immunity, a State officer or employee bears the burden of showing that the plaintiff's claims arise from the officer's or employee's performance of a discretionary duty on behalf of the State. Upon such a showing, the burden shifts to the plaintiff, who must show that the officer or employee acted fraudulently, willfully, maliciously, or in bad faith."

_Id._; quoting, **_Ex Parte Alabama Dept. of Transportation_**, 764 So. 2d 1263, 1268 (Ala. 2000). Based on the foregoing, the collective **DEFENDANTS** are not entitled to sovereign immunity under Article I, Section 14 of the Constitution of Alabama of 1901. We now move to the question of whether discretionary function immunity is available to any of the **DEFENDANTS**.

**VIII.    THE INDIVIDUAL EDUCATOR DEFENDANTS ARE NOT ENTITLED TO STATE AGENT IMMUNITY BECAUSE THEIR ACTS AND OMISSIONS, AS ALLEGED IN PLAINTIFFS' COMPLAINT, FALL WITHIN ONE OR MORE OF THE RECOGNIZED EXCEPTIONS TO IMMUNITY.**

The proposition is well understood that discretionary function immunity (also known as qualified or substantive immunity, and/or State agent immunity) is available to a state

officer or employee acting within the general scope of his authority, but only when certain circumstances are present. **_Grant v. Davis_**, 537 So. 2d 7 (Ala. 1988). "Whether a particular defendant is engaged in a protected discretionary function and is thereby immune from liability for the injuries he causes is a question of law to be decided by the trial court." _Id._, 537 So. 2d at 8. It has been explicitly held that:

> "The following factors should be considered in determining whether a state officer or employee is engaged in a discretionary function: the nature and importance of the function that the officer or employee is performing: the extent to which passing judgment on the exercise of discretion will amount necessarily to passing judgment on the conduct of a coordinate branch of government; the extent to which the imposition of liability would impair the free exercise of discretion by the officer or employee; the extent to which the ultimate financial responsibility will fall on the officer or employee; the likelihood that harm will result to members of the public if the action is taken; the nature and seriousness of the type of harm that may be produced; and the availability to the injured party of other remedies and other forms of relief."

**_Mitchell v. Davis_**, 598 So. 2d 801 (Ala. 1992), citing with approval, **_Barnes v. Dale_**, _supra_.

Some two (2) years prior to it's holding in the case of **_Ryans v. Hayes_**, _supra_, the Supreme Court of Alabama explicitly and unambiguously held that a claim alleging personal injury caused by the alleged negligent conduct of a government employee, even when that conduct is committed in the line and scope of his employment, is not within the ambit of the constitutional prohibition against lawsuits against the State as expressed in Article I, §14 of The Constitutional of Alabama of 1901:

> ". . . though the state cannot be sued (Section 14, Constitution), its immunity from suit does not relieve the

> officers of the State from their responsibility for an illegal
> trespass or tort on the rights of an individual, even
> though they act pursuant to authority attempted to be
> conferred by the state . . . [w]e believe that the rule is
> universal that an agent is not excused from personal
> liability for a tort which he commits for and in the name
> of his principal whether the principal is liable to suit or
> not . . .   An individual cannot justify a tort on a
> contention that it is for the state, if the state had no such
> right.  If the state had the right, then its officers, acting
> by its authority, were justified.  The officers cannot be
> justified upon a mistaken notion of state authority.  An
> inadvertent tort-feasor is such, though he may not be
> liable to the amount of damages as a willful tort-feasor
> would be . . . [t]he wrong is that of the officers
> personally as well as that of their principal.  The officers
> are sued, not because the state has committed a
> wrong, but because they personally, though acting as
> officers, have done so.  When a person commits a tort,
> it is wholly immaterial upon the question of his liability
> whether he was acting officially or personally."

**Ex Parte Cranman**, 792 So. 2d 392, 402 (Ala. 2000); *quoting*, **DeStafney v. University**

**of Alabama**, 413 So. 2d 391 (Ala. 1981); other citations omitted.

In **Ex Parte Cranman**, *supra*, a student at the University of Alabama brought a

medical malpractice action against university physicians alleging they negligently and

wantonly breached the applicable standard of care in failing to diagnose and treat his

testicular cancer.  The student died during the pendency of the litigation and his personal

representative was substituted as plaintiff.  The trial court granted a summary judgment in

favor of the physicians concluding that they were protected from liability by discretionary-

function immunity.  The executor appealed to the Alabama Court of Civil Appeals which

affirmed the ruling of the trial court.  **Cranman v. Maxwell**, 792 So. 2d 386 (Ala. Civ. App.

1998).  The executor then filed a petition for certiorari review by the Supreme Court of

-42-

Alabama which reversed and remanded the cause. In reaching it's decision, the Supreme

Court clearly used a balancing test between competing sections of the State constitution.

Article I, §13 provides that ". . . all courts shall be open; and that every person, for any

injury done him, in his lands, goods, person, or reputation, shall have a remedy by due

process of law; and right and justice shall be administered without sale, denial, or delay."

On the other hand Article I, §14 provides "[t]hat the State of Alabama shall never be made

a defendant in any court of law or equity." In reaching a conclusion that balanced these

competing interests the Court held that:

> "The time has come to face the necessity of defining
> "injury," as that word is used in §13, in lawsuits against
> State employees alleging torts committed in the line of
> duty, in a manner that neither violates §13 nor prefers
> §14 or §6.01 of the Judicial Article over §13. We
> decline to label all discretionary acts by an agent of the
> State, or all acts by such an agent involving skill or
> judgment, as "immune" simply because the State has
> empowered the agent to act. Such an expansive view
> of the power of the State to act with immunity for its
> agents would be inconsistent with the rights secured by
> §13."

792 So. 2d at 405. Moreover, the **PLAINTIFFS** in the matter at bar would reiterate that the

**DEFENDANTS**' mere status as state officials does not automatically cloak them with

immunity. See, e.g., **Patton v. Black**, supra, (claim by student victim of tumbling accident

presented jury question as to immunity of teacher); **Lightfoot v. Floyd**, 667 So. 2d 56 (Ala.

1996) (student claiming property improperly seized could sue investigator); and **Kassaw**

**v. Minor**, 717 So. 2d 382 (Ala. Civ. 1998) (student who slipped on hallway floor could sue

student employee of college). Based on the foregoing, we submit that none of the

**DEFENDANTS** are entitled to immunity of any kind.

IV.    **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF PARENTS' CLAIMS FOR LOSS OF SERVICES OF A CHILD IS DUE TO BE DENIED.**

DEFENDANTS argue that they are entitled to summary judgment as to the loss of services claim asserted by JESSICA's parents because it has not been properly pled and because it is entirely derivative of the claims of little Jessica. We respectfully disagree and, in support thereof, would adopt and incorporate herein the text our previous arguments above as if set forth herein *in* *haec* *verba*.

**CONCLUSION**

It is abundantly clear that a school district is required by the I.D.E.A. to provide an I.E.P. for each disabled child. The collective DEFENDANTS have not even bothered to deny that they have failed to do this nor have they denied that little Jessica is disabled. Moreover, the DEFENDANTS should be estopped to deny that LITTLE JESSICA is entitled to services and benefits, under the provisions of I.D.E.A., because they have started providing some but not all of said services and benefits after they were served with copies of this lawsuit. This is evidence of a tacit admission of the merits of PLAINTIFFS' claims brought pursuant to the act. Based on all of the foregoing, we submit that our complaint adequately alleges all of the necessary elements of each cause of action in order to satisfy the requirement of subject matter jurisdiction, that substantial evidence in support of PLAINTIFFS' claims has been presented in deposition testimony, and that DEFENDANTS'

*motion for summary judgment is due to be denied.*

*Respectfully submitted this the ___14___ day of March, 2006.*

*GEORGE E. JONES, III*
*Ala. Bar I.D. ASB-9546-5826*
*Attorney for the Plaintiffs*

### CERTIFICATE OF SERVICE

*I hereby certify that I have this the __14__ day of March, 2006, served a copy of the*

*foregoing by placing same in the United States Mail, postage prepaid and addressed to:*

*Mark S. Boardman, Esquire*
*Katherine C. Hortberg, Esquire*
*BOARDMAN, CARR & WEED, P.C.*
*P. O. Box 382886*
*Birmingham, Alabama 35238-2886*
*ATTORNEYS FOR DEFENDANTS*

*OF COUNSEL*

**ADDRESS OF COUNSEL:**

**GEORGE E. JONES, III**
**ATTORNEY & COUNSELOR AT LAW**
**711 Alabama Avenue**
**P. O. Box 9**
**Selma, Alabama 36702-0009**
**(334) 874-6617**