**American Court Reporting**
**toll-free (877) 320-1050**

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3           NORTHERN DIVISION

4

5  CIVIL ACTION NUMBER

6  CASE NO:  2:05-CV-0699-C

7

8  BENNY L. WRIGHT and KATHERINE E. WRIGHT,
    as parents and next friends of JESSICA W.,

9  a minor,

10     Plaintiff(s),

11  vs.

12  THE CHILTON COUNTY BOARD OF EDUCATION, et
    al.,

13

     Defendant(s).

14

15

         DEPOSITION TESTIMONY OF:

16

            BENNY L. WRIGHT

17

18

19

February 3, 2006

20                             3:40

     p.m.

21

22

COURT REPORTER:

23

Gwendolyn P. Timbie, CSR



1        S T I P U L A T I O N S

2        IT IS STIPULATED AND AGREED by and

3   between the parties through their

4   respective counsel that the deposition of

5   BENNY L. WRIGHT, may be taken before

6   Gwendolyn P. Timbie, Certified Shorthand

7   Reporter and Notary Public, State at

8   Large, at the Chilton County Board of

9   Education, Clanton, Alabama, on February

10  3, 2006, commencing at approximately

11  3:40 p.m.

12       IT IS FURTHER STIPULATED AND

13  AGREED that the signature to and the

14  reading of the deposition by the witness

15  is waived, the deposition to have the same

16  force and effect as if full compliance had

17  been had with all laws and rules of Court

18  relating to the taking of depositions.

19       IT IS FURTHER STIPULATED AND

20  AGREED that it shall not be necessary for

21  any objections to be made by counsel to

22  any questions, except as to form or

23  leading questions, and that counsel for

**American Court Reporting**
**toll-free (877) 320-1050**

1  the parties may make objections and assign

2  grounds at the time of trial or at the

3  time said deposition is offered in

4  evidence, or prior thereto.

5          Please be advised that this is the

6  same and not retained by the Court

7  Reporter, nor filed with the Court.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**American Court Reporting**
**toll-free (877) 320-1050**

Page 4

```
1                        I N D E X

2     EXAMINATION BY:                    PAGE NO.

3     Ms. Hortberg                          6

4     Mr. Jones                            69

5     Certificate                          80

6

7

8     (No exhibits marked to this deposition.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

```
 1              A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF(S):

 4         GEORGE E. JONES, III, Esquire
           Attorney at Law
 5         711 Alabama Avenue
           Selma, Alabama   36702
 6

 7

      FOR THE DEFENDANT(S):
 8

           KATHERINE C. HORTBERG, Esquire
 9         Boardman, Carr, Weed & Hutcheson, P.C.
           400 Boardman Drive
10         Chelsea, Alabama   35043

11

12    ALSO PRESENT:

13         MILDRED ELLISON

14         ANN GLASSCOCK

15         ANN THOMAS

16         PEGGIE S. HARRIS

17         DARRELL BAKER

18         DONNY FINLAYSON

19         KATHERINE E. WRIGHT

20         JESSICA W.

21

22

23
```

**www.AmericanCourtReporting.com**
**February 3, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

1    I, Gwendolyn P. Timbie, Certified

2  Shorthand Reporter and Notary Public for

3  the State of Alabama at Large, acting as

4  Commissioner, certify that on this date,

5  pursuant to the Federal Rules of Civil

6  Procedure, and the foregoing stipulation

7  of counsel, there came before me at the

8  Chilton County Board of Education,

9  Clanton, Alabama, commencing at

10  approximately 3:40 p.m., on February 3,

11  2006, Benny L. Wright, plaintiff in the

12  above cause, for oral examination,

13  whereupon the following proceedings were

14  had:

15

16    BENNY L. WRIGHT,

17  Having been first duly sworn, was examined

18  and testified as follows:

19

20  EXAMINATION BY MS. HORTBERG:

21    Q    Mr. Wright, I know you've been

22  in here since nine o'clock this morning

23  when I first took the deposition of your

**American Court Reporting**
**toll-free (877) 320-1050**

1    daughter and then also now the deposition
2    of your ex-wife.  My name is Kate
3    Hortberg, and I represent the defendants,
4    the people that you have sued on behalf of
5    your daughter in this lawsuit.  I'm here
6    today to ask you some questions.
7         And I've given these ground rules
8    before, but I'll give them to you again.
9    You are under oath today.  If you need to
10   take a break, please let me know.  I'll be
11   happy to take a break.  Please give a
12   verbal answer.  Please let me know if you
13   don't understand a question.  Please let
14   me know if I'm raising my voice to you.
15   And if you answer a question, I'm going to
16   assume that you understood it.  Is that
17   fair?
18        A     That's fair.
19        Q     Do you understand all those
20   ground rules?
21        A     I do.
22        Q     Since I have not received your
23   responses to your interrogatories, I have

**American Court Reporting**
**toll-free (877) 320-1050**

1  to ask you these questions, and I need for

2  you to answer truthfully, and I just don't

3  know whether it's information that your

4  daughter knows.  So I would assume for

5  your sake of your privacy -- I'm just

6  going to ask you these right now.  Okay?

7          A      Okay.

8              MR. JONES:  You understand

9  she's going to ask you some questions

10  while Jessie is out of the room?

11             THE WITNESS:  There's

12  nothing Jessie --

13             MR. JONES:  No.  Do you

14  understand?

15             THE WITNESS:  Do I

16  understand --

17             MR. JONES:  Yes.

18             THE WITNESS:  -- she's going

19  to ask me some questions while Jessica is

20  out of the room?

21             MR. JONES:  Right.  And the

22  reason she's doing that is a courtesy to

23  you because it may be things that Jessie

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1   doesn't need to hear.  Is that correct?

2           MS. HORTBERG:  That's what I'm

3   assuming.  Jessica may know all of this.

4   But I'm just -- out of an abundance of

5   caution --

6           THE WITNESS:  Okay.  That's

7   fine.

8           MR. JONES:  Is that okay with

9   you?

10          THE WITNESS:  That's okay.

11      Q     (By Ms. Hortberg)  Can you

12  tell me whether or not you have ever been

13  arrested?

14      A     I have.

15      Q     What year was that?

16      A     1995.

17      Q     What was the charge?

18      A     I had federal and state

19  charges in 1995.  Federal was conspiracy

20  to violate the RICO statute, and I pled

21  guilty to a lesser charge, and I don't

22  remember what it was.  State charges was

23  violating the Alabama Deceptive Trade

**www.AmericanCourtReporting.com**
**February 3, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 10

1   Practice Act, and I pled guilty to a

2   lesser charge on that, and I don't

3   remember, you know, what it was.  Also, in

4   2003, I'm going to guess, for harassment

5   from Kathy.

6       Q       Were y'all divorced at that

7   time that that charge was brought?

8       A       Getting -- getting it.

9       Q       Separated?

10      A       Right.  I believe so.

11      Q       Going back to the 1995

12  charges -- and you pled guilty to lesser

13  charges.  Did you serve any time for any

14  of those?

15      A       Ten months.

16      Q       What prison?

17      A       Maxwell.

18      Q       Was that a reduced sentence --

19  I mean, a reduced time from your

20  sentence?

21      A       I think my sentence was a year

22  and a day.

23      Q       You weren't married to

**American Court Reporting**
**toll-free (877) 320-1050**

Page 11

1   Ms. Wright at that time, though; correct?

2          A      I was.

3          Q      Oh, you were.  And this was

4   when Jessica was three years old?

5          A      Right.

6          Q      Emily was not born yet?

7          A      Emily was born in '95.

8          Q      While you were in prison?

9          A      No.  Emily was born in June

10  before I went down there in the end of

11  November.

12         Q      Several people had these same

13  charges brought against them, I would

14  assume, since this was a conspiracy

15  charge?

16         A      Yes.

17         Q      Did everyone plead guilty to

18  lesser charges?

19         A      Actually, I don't know the

20  answer to that question.

21         Q      Everyone served time?

22         A      No.

23         Q      Were you the only one that

**American Court Reporting**
**toll-free (877) 320-1050**

Page 12

1    served time?

2          A    No.

3          Q    What was the basis for the

4    RICO violation?

5          A    What was the base -- can you

6    ask it another way?

7          Q    What were you alleged to have

8    done to conspire to violate RICO?

9          A    I marketed and promoted and

10   sold business opportunities.

11         Q    Were these online or across

12   the phone lines?

13         A    All of the above.

14         Q    Who was your attorney?

15         A    Tommy Spina.

16         Q    In 2003 did you have an

17   attorney?

18         A    Bill Powers.

19         Q    Has Mr. Blankenship ever

20   represented you in any of these criminal

21   matters?

22         A    No.

23         Q    Are y'all friends?  Or how do

**American Court Reporting**
**toll-free (877) 320-1050**

1  you know Mr. Blankenship?

2      A     Best friends.  Business

3  partners from many, many years ago.

4      Q     He wasn't involved in the RICO

5  deal, was he, Mr. Blankenship?

6          THE WITNESS:  Have I got to

7  answer that question?

8          MR. JONES:  If you know the

9  answer.  If you know the answer or you

10  don't, you've got to tell her.  If you

11  don't know the answer -- just give her a

12  yes or no answer or tell her.

13     Q     Was he convicted of any crime?

14     A     No.

15     Q     Was he charged with any RICO

16  violation?

17     A     I don't know.

18     Q     Y'all never talked about it?

19     A     No.

20     Q     Are y'all business partners

21  today?

22     A     No.

23     Q     Were y'all ever business

**American Court Reporting**
**toll-free (877) 320-1050**

1    partners when you owned the auto lot up in

2    Thorsby?

3         A    No.

4         Q    When's the last time you were

5    business partners?

6         A    The late '80s or early '90s.

7         Q    Did you go with your daughter

8    and wife to see Mr. Blankenship in

9    Birmingham two days ago?

10        A    I did.

11        Q    Related to this case?

12        A    Yes.

13        Q    Did George Jones accompany

14   y'all to that meeting?

15            MR. JONES:   Object.

16        A    No.

17        Q    Did you ask Mr. Blankenship

18   for a copy of anything you had ever

19   written to anyone related to the board?

20            MR. JONES:   You can answer

21   that.

22        A    No.

23        Q    Have you ever seen a copy of

**American Court Reporting**
**toll-free (877) 320-1050**

Page 15

1   what has been marked as Defendants'
2   Exhibit 1, the copy that was faxed to you
3   from someone in Mr. Blankenship's office?
4           A       Yes.
5           Q       Do you remember whether you
6   saw this before or after March 9th, before
7   or after it was sent?
8           A       I don't know.
9           Q       Did you meet with
10  Mr. Blankenship about it prior to him
11  sending it?
12          A       Yes.
13          Q       Do you have a copy of any
14  other letter Mr. Blankenship has ever sent
15  to Mr. Jackson?
16          A       I do not have in my
17  possession.
18          Q       Do you know who would have a
19  copy of that in their possession?
20          A       I do not.  Mr. Blankenship --
21          Q       He's looking for it and he
22  can't find it, though; right?
23          A       I don't know.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 16

1    Q      Haven't you asked him to look

2  for any other letters that he has?

3    A      I haven't been able to talk

4  with him today.

5    Q      I understood that y'all had

6  talked to him earlier this week to find

7  those.

8          MS. HORTBERG:  George, am I

9  wrong in that understanding?

10          MR. JONES:  Well, the witness

11  can talk about his conversations, but I

12  don't think he can -- I don't think he can

13  tell you what my conversations were with

14  Mr. Blankenship.

15          MS. HORTBERG:  Off the record

16  for a second.

17      (Off-the-record discussion)

18    Q      Do you have anything else you

19  want to add about this letter from

20  Mr. Blankenship?

21    A      No.

22    Q      Do you know who this is from

23  Mr. Blankenship's office, John Shivick?

**American Court Reporting**
**toll-free (877) 320-1050**

1    A    His legal intern.

2    Q    Mr. Blankenship, does he have

3  his own law firm now?

4    A    Yes.

5    Q    Does he have anybody else

6  there with him besides his legal intern?

7    A    Rephrase that question.

8    Q    Does he have any other

9  attorneys there in the office with him?

10   A    Yes.

11   Q    Do you know their names?

12   A    No.

13   Q    How old is this Brandon

14  Blankenship, L.L.C.?

15   A    How old is the L.L.C.?

16   Q    Well, the letter that I

17  understood -- or I understood that

18  Mr. Blankenship was actually with Gilbert

19  and Cook law firm.  Do you know how long

20  he's been on his own?

21   A    Yes.

22   Q    How long?

23   A    Two months.

**www.AmericanCourtReporting.com**
**February 3, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 18

1    Q    Has Mr. Blankenship ever made
2    an appearance for you in any court
3    proceeding?
4    A    Yes.
5    Q    What proceeding was that?
6    A    I don't -- I don't remember.
7    Q    How many court proceedings
8    have you been involved in in your life
9    besides the criminal conviction, a
10   divorce?  Were you involved in the lawsuit
11   against Mr. Beach?
12   A    No.
13   Q    This is a third lawsuit that I
14   can think of.  What other lawsuits have
15   you ever been involved in?
16   A    A third?
17   Q    Well, I consider a divorce a
18   lawsuit because papers were filed.  The
19   criminal proceeding would have been a suit
20   filed --
21   A    Okay.
22   Q    -- and then this is a third.
23   If you can think of any beyond those that

**www.AmericanCourtReporting.com**
**February 3, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

1   Mr. Blankenship would have made an

2   appearance for you, I'd like to know what

3   that case is.

4        A    I don't recall.  He's helped

5   me from to time, but I can't give you a --

6   you know, on what.

7        Q    I'm asking you did he ever

8   appear as an attorney on your behalf in

9   any lawsuit that was filed with the

10  court.

11       A    No.

12       Q    As far as this civil lawsuit,

13  is this the only one you've ever been

14  involved in where you're asking for money

15  damages?

16       A    You stated that you call a

17  divorce a civil lawsuit.  This is the --

18  yes.  I think the answer to that is, this

19  is my first other than two divorces.

20       Q    Oh, you've been divorced

21  before?  Okay.  Who was your first wife?

22       A    Sherry Wilson.

23       Q    Where does Ms. Wilson live

**American Court Reporting**
**toll-free (877) 320-1050**

1    today?

2    A    I couldn't tell you.

3    Q    Does she live in the state of

4    Alabama?

5    A    I couldn't tell you.

6    Q    When were y'all married?

7    A    Early '80s.

8    Q    When were y'all divorced?

9    A    I don't really remember.  '86.

10   Q    What county was the divorce

11   in?

12   A    Here.  Chilton.

13   Q    And your other divorce from

14   Ms. Wright was also filed here?

15   A    Chilton.

16   Q    Did you use the same attorney

17   for both divorces?

18   A    No.

19   Q    What attorney did you use for

20   Ms. Wilson's divorce?

21   A    Sibley Reynolds.

22   Q    Was your divorce attorney?

23   A    Actually, we used the same

**American Court Reporting**
**toll-free (877) 320-1050**

1    one.

2          Q      Was that Mr. Reynolds?

3          A      Right.

4          Q      Do you agree with your wife

5    that you all used the same attorney for

6    your divorce, you and Ms. Wright's

7    divorce?

8          A      I do.

9          Q      What was that person's name?

10         A      Liz Huntley.

11         Q      Let me get into that

12   harassment charge, and then we can let

13   Jessica back in.  That harassment charge,

14   what was the basis for that?

15         A      My stepson and Kathy had

16   gotten into it, and I was trying to stop

17   their fuss and get him to leave, and the

18   county sheriff's deputy pulled up and

19   arrested me.

20         Q      For harassment?

21         A      That's what happened, and

22   that's what I had to plead guilty to.

23         Q      Did you serve any time for

**American Court Reporting**
**toll-free (877) 320-1050**

Page 22

1    that?

2         A       No.

3         Q       Did you pay a fine?

4         A       Fifty bucks.

5         Q       Your stepson, was he arrested

6    for harassment?

7         A       No.

8         Q       He didn't live with y'all at

9    that point in time, though; right?

10        A       No.

11        Q       Did you live at the County

12   Road 41 address during that time when you

13   were arrested, or did your ex-wife?

14        A       I don't remember if I was

15   living there or living at my office.

16        Q       And where was the office?

17        A       18870 Highway 31, Clanton.

18        Q       Do you still own that office?

19        A       No.

20        Q       When did you sell it?

21        A       I'm going to say in the summer

22   of '04.

23        Q       And your wife said you're now

**American Court Reporting**
**toll-free (877) 320-1050**

1    operating a car lot on the lot next door

2    to your home?

3         A     Right.

4         Q     And she did not know whether

5    the name of your -- what's the name of

6    your company again?

7         A     Matrix.

8         Q     Is that an L.L.C. or an

9    S-corporation?

10        A     L.L.C.

11        Q     Who incorporated that for you?

12        A     I did.

13        Q     Are there any other members?

14        A     No.

15        Q     You're the sole member?

16        A     Yes.

17        Q     When was it incorporated?

18        A     I believe October.

19        Q     2005?

20        A     Right.

21        Q     You had already been doing

22    business, I guess, as a sole proprietor

23    prior to that time on the car lot?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 24

1      A      Right.  Uh-huh.

2      Q      Now, were you incorporated

3 when you were selling cars in Thorsby?

4      A      Ben Wright Automotive.

5      Q      Was that an L.L.C. or an

6 S-corp?

7      A      L.L.C.

8      Q      Has that company been

9 dissolved?

10      A      I have not dissolved it.

11      Q      Were you the sole member of

12 that company too?

13      A      I don't remember.

14      Q      What was your reason for

15 shutting down Ben Wright Automotive in

16 Thorsby?

17      A      I got depressed after my

18 divorce.

19      Q      Were you employed after you

20 shut down Ben Wright Automotive?

21      A      Not until I went back into the

22 car business.

23      Q      And when was that?

**www.AmericanCourtReporting.com**
**February 3, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

1     A    2005.

2     Q    Summer?

3     A    Summer, I'd say.

4     Q    So how long a period were you

5 out of work?

6     A    I'm going to say probably --

7 properly around a year, I'm guessing.  I

8 had family that helped me, if that's your

9 next question.

10    Q    Did you receive any sort of

11 unemployment benefits during that time?

12    A    I did not.

13    Q    Did you seek any sort of

14 counseling for your problems after the

15 divorce?

16    A    I saw my pastor.

17    Q    The same pastor your daughter

18 Emily has seen?

19    A    Yes.

20    Q    Did you also discuss with your

21 pastor any problems you had about the

22 molestation of your daughter?

23    A    I have.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 26

1      Q      You understand that your

2  ex-wife and your daughter Jessica have not

3  talked to that counselor about any issues?

4      A      I don't know whether they have

5  or not.

6      Q      You've never been in any

7  sessions where the whole family has been

8  there with that pastor?

9      A      Not with that pastor.

10     Q      Have you ever been to any

11 counseling session where the whole family

12 has been there?

13     A      Kathy and I had marriage

14 counseling.

15     Q      Where was that?

16     A      At the association office.

17 The Baptist association office.  I'm

18 sorry.

19     Q      Were your daughters ever

20 brought into that counseling?

21     A      No.

22     Q      This was prior to the divorce

23 or after y'all's reconciliation?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 27

1      A      Prior.

2      Q      Did you ever take any action

3   against Mr. Beach for his molestation of

4   your daughter Emily?

5      A      No.

6      Q      And I think your wife

7   testified that she does a lot of the

8   taking of Jessica back and forth to the

9   doctor's office, orthodontist's office --

10     A      Yes.

11     Q      -- those sort of

12  appointments.  Do you ever go along with

13  Jessica?

14     A      Sometimes.

15     Q      Would there be occasions where

16  you'll be the one to check her out of

17  school to take her to appointments?

18     A      I have.

19     Q      Do you always bring back an

20  excuse when you come back if the doctor

21  has provided that to you?

22     A      I'm really not good at that.

23  Sometimes we would have to call and get

Page 28

1   one later because I would forget or

2   something.

3           Q       Did you live with your wife

4   and daughters when they lived in Skyline?

5           A       I did.

6           Q       You did?  You lived with your

7   mother-in-law?

8           A       We lived with our

9   mother-in-law.  Uh-huh.

10          Q       And did you ever attend any

11  meetings at Skyline Elementary School

12  about Jessica?

13          A       I did not.

14          Q       Did you ever go to any

15  parent/teacher conferences at Skyline

16  while Jessica was there?

17          A       I did not.

18          Q       What about when she was in the

19  fifth grade at Clanton Intermediate

20  School?  Did you ever attend any

21  parent/teacher conferences?

22          A       I need to clarify the

23  intermediate and the middle school.  I get

**American Court Reporting**
**toll-free (877) 320-1050**

1    them crossed.

2        Q    Intermediate is fifth grade.

3        A    Intermediate is Adair?

4        Q    No, sir.  Fifth grade just --

5        A    Okay.  Now, reask your

6    question, please.

7        Q    Did you ever attend any

8    parent/teacher conference while she was in

9    the fifth grade at the intermediate

10   school?

11       A    No.  No.  Fifth grade was

12   wonderful.

13       Q    Did you ever have a chance to

14   go up to the school while she was in the

15   fifth grade?

16       A    I did.

17       Q    Would you pick her up from

18   school?  Or what would be your occasion to

19   be up there in the fifth grade?

20       A    Pick her up, let her out.

21   Half the time -- you know, sometimes

22   she'll ride the bus, sometimes she

23   wouldn't.  To take her lunch, take her

**American Court Reporting**
**toll-free (877) 320-1050**

Page 30

1   food, you know.  Whatever reason that I

2   would need to be.

3        Q     Did you ever have an occasion

4   to speak to the principal over at the

5   fifth grade school?

6        A     Mr. Cobb?

7        Q     Mr. Cobb.  Did you make

8   appointments to speak with him, or did you

9   just happen to see him when you were up at

10  the school?

11       A     Just see him when I was up at

12  the school.

13       Q     Did you ever make any

14  complaints to Mr. Cobb about the way your

15  daughter was being treated at that school?

16       A     The school was wonderful.

17       Q     And she made good grades that

18  year; right?

19       A     I think that she made straight

20  As.

21       Q     Then the next year she went to

22  middle school, which is the sixth grade

23  school, and I think it was called Adair,

**American Court Reporting**
**toll-free (877) 320-1050**

1  when they were in that old building.

2     A     Right.

3     Q     What I understand.  And did

4  you ever have an occasion to go to any

5  parent/teacher conference when Jessica was

6  in the sixth grade?

7     A     I don't know of a

8  parent/teacher conference.  What are you

9  calling -- excuse me.  Rephrase that

10  question.  I don't understand a

11  "parent/teacher conference".

12     Q     I guess it's just any time a

13  parent requests a meeting with any

14  specific teacher, is what I'm referring to

15  as a parent/teacher conference.

16     A     I don't remember.  I may have.

17     Q     But you don't have any

18  specific recollection of a meeting with a

19  teacher in the sixth grade?

20     A     In the sixth grade, I don't

21  think so.

22     Q     I meant to ask this of your

23  wife, and I'll go ahead and ask you.  Are

**American Court Reporting**
**toll-free (877) 320-1050**

Page 32

1   you and she involved at all in the

2   Parent/Teacher Association, the PTA or

3   PTO?

4        A    I think that we pay the

5   membership every year, but, you know, we

6   just do that to support the school, and we

7   don't, you know, go to any of the meetings

8   or anything.

9        Q    When Jessica was in the band,

10  was there any sort of band boosters club

11  or any sort of parent support group for

12  the band?

13       A    I think that there is

14  boosters, and I don't remember whether we

15  participated -- you know, whether we

16  joined that or whether we didn't.  I don't

17  remember.

18       Q    And when she was on the

19  cheerleading squad, was there some sort of

20  parent support group for the cheerleading

21  squad?

22       A    Other than the parents going

23  to the games and all sitting together, you

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1    know, I guess.  I don't know what you

2    would define a "support group".

3        Q    Well, I just meant like a

4    group of parents who would raise funds for

5    the cheerleaders to go to competitions or,

6    you know, have new uniforms or whatever.

7        A    I don't remember whether it

8    was when -- for CAC or for Adair that they

9    had to raise funds, you know.  But yeah.

10   We would get out and -- for one of them,

11   we had to sell ads, you know, or something

12   for T-shirts, and I don't remember which.

13   But yes.  We did -- we did participate in

14   that.  And the parents -- a lot of times

15   after the ball games, all of the parents

16   would go together and eat somewhere.

17       Q    After the girls had

18   cheerleaded somewhere?

19       A    Right.  A lot of the time.

20       Q    And then this year that she's

21   been on the dance team, do y'all go watch

22   her perform at the, I guess, halftime show

23   or whatever the dance team does?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 34

1      A      Kathy does.

2      Q      Do you not?

3      A      I did not.

4      Q      Why is that?

5      A      I get depressed and emotional

6   when I -- you know, about this situation,

7   and I just really -- I thought it would be

8   better that I just stayed away.  I've had

9   a couple of meetings with Mr. Finlayson

10  during the seventh grade, and it's just

11  better that I stayed away, and I did.

12     Q      Seventh grade was the year she

13  was a cheerleader, though; right?

14     A      Well, she was a cheerleader

15  the first half of the seventh grade.

16     Q      And that was the time --

17  during the first half of the seventh grade

18  was the time that -- did you ever have any

19  meetings with Mr. Finlayson while she was

20  a cheerleader during the first half of the

21  seventh grade?

22     A      Other than speaking to him

23  when I would walk in and out of the school

**American Court Reporting**
**toll-free (877) 320-1050**

Page 35

1    to the office, to carry Jessica money or a

2    snack or something to the office, no.  No,

3    I didn't have -- I don't think that I had

4    a meeting with him the first half.

5          Q      Do you have a specific

6    recollection of when the first time was

7    you would have met with Mr. Finlayson

8    during the seventh grade?

9          A      I do.

10         Q      What day was that?

11         A      The day after I found out

12   about Mr. Baker not letting her go to the

13   bathroom.

14         Q      But you don't have a specific

15   recollection of when in the school year

16   that was?

17         A      Of a date?

18         Q      Right.

19         A      No, I can't tell you a date.

20   But I did go see him about that the next

21   day.

22         Q      I think that your wife

23   testified that she actually called

**American Court Reporting**
**toll-free (877) 320-1050**

Page 36

1    Mr. Finlayson about that incident.

2        A    I don't know if she did or she

3    did not, but I did go see him.

4        Q    Did you make an appointment,

5    or did you just go up to the school?

6        A    I walked in and asked either

7    Ms. Johnson or Smitherman, one of them,

8    you know, could I see him, and I waited

9    until he came into his office, and then he

10   saw me.

11       Q    So when he heard that you were

12   out there and wanted to speak with him, he

13   was agreeable to speaking with you?

14       A    That's right.

15       Q    Has Mr. Finlayson ever denied

16   you the opportunity to come talk to him if

17   you've made that request?

18       A    No.

19       Q    Has any educator in the

20   Chilton County Schools ever denied you the

21   opportunity to come speak to them if

22   you've made that request of them?

23       A    No.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 37

1    Q    The conversation that you had

2    with Mr. Finlayson after the incident in

3    Mr. Baker's class, was that the

4    conversation you had with him about his

5    son who has Down syndrome?

6    A    Not at that meeting, no.

7    Q    The first meeting, then, was

8    about --

9    A    Mr. Baker.

10    Q    And about whether or not

11    Jessica would be allowed to have access to

12    the restroom any time she needed it.  Did

13    you understand that that was to be

14    granted?

15    A    I even called the hospital;

16    was referred to either Kathy Baines or the

17    social worker who said they would fax

18    something down there that she needed

19    unrestricted, unasked -- that may not be a

20    proper word -- access to the bathrooms,

21    and the doctor signed it.  And

22    Mr. Finlayson in that meeting told me how

23    he would handle it.  But I have a

**American Court Reporting**
**toll-free (877) 320-1050**

Page 38

1  different recollection of events

2  afterwards.

3        Q     Your daughter testified that

4  her only two -- that her recollection was

5  that there were two times where she had

6  been denied access to the restroom,

7  Ms. Mitchell and Mr. Baker, and after that

8  she did not have any problem.

9        A     I'm sure that she

10 misunderstood your question.

11       Q     Well, sir, I asked her to

12 explain -- to ask me any time she

13 misunderstood a question.

14       A     She's thirteen years old, and

15 I'm --

16             MR. JONES:  Do not argue with

17 the lawyer.  Just answer her questions.

18       Q     During the meeting with

19 Mr. Finlayson, the very first one where

20 you talked about Mr. Baker's class, you

21 understood at the end of that meeting

22 there would be a resolution to that

23 issue.  Mr. Finlayson said he would speak

**American Court Reporting**
**toll-free (877) 320-1050**

Page 39

1    to Mr. Baker about it?

2         A      He assured me he would handle

3    it.

4         Q      And Jessica never had a

5    problem in Mr. Baker's class again; right?

6         A      I don't think that's how it

7    was.

8         Q      Did you ever go speak to

9    Mr. Finlayson again about Mr. Baker?

10        A      Not about Mr. Baker.  We did

11   talk to --

12        Q      Well, sir, that was my

13   question.  Let's go one at a time here.

14   Did you ever speak to Mr. Baker about any

15   other problems you've had with him?

16        A      No.

17        Q      Did you ever speak to anyone

18   about any other problems you had with

19   Mr. Baker that year?

20        A      I may have spoke to Ann about

21   it also.

22        Q      Well, I'm not asking you to

23   speculate here.  Do you have a specific

**American Court Reporting**
**toll-free (877) 320-1050**

Page 40

1    recollection of speaking with someone

2    you're calling "Ann" about Mr. Baker?

3         A    I do not have a specific

4    recollection.

5         Q    And who is Ann?

6         A    Ann Glasscock.

7         Q    Whose daughter also didn't

8    make cheerleading the same time that your

9    daughter didn't?

10         A    That's my understanding.

11         Q    How many times did you speak

12    to Mr. Finlayson during Jessica's seventh

13    grade year?

14              MR. JONES:  I need a break for

15    just a second.

16                   4:06 p.m.

17                 (Recess taken)

18                   4:13 p.m.

19         Q    Mr. Wright, we are still under

20    oath.  You understand that?

21         A    I do.

22         Q    During your meeting with

23    Mr. Blankenship two days ago, did you all

**American Court Reporting**
**toll-free (877) 320-1050**

Page 41

1    discuss ongoing litigation or potential

2    future litigation?

3                MR. JONES:  I'm going to

4    object to that question as being protected

5    by the attorney/client privilege.

6                MS. HORTBERG:  I would say

7    that attorney/client privilege has been

8    waived as to those two areas of discussion

9    when you send a note or an excuse to

10   school saying why Jessica was absent.

11               MR. JONES:  May I see that?

12   All he said was that he was meeting with

13   her in his office concerning ongoing

14   litigation of -- he didn't say what it

15   was.

16               MS. HORTBERG:  That wasn't my

17   question, George.  My question was, did he

18   meet with Mr. Blankenship two days ago to

19   review matters concerning ongoing

20   litigation or potential future

21   litigation.

22               MR. JONES:  Without revealing

23   the substance of your conversations, you

**American Court Reporting**
**toll-free (877) 320-1050**

Page 42

1    can answer the question yes or no.

2          A      Repeat it.

3          Q      Did you meet with Brandon

4    Blankenship two days -- on February 2nd --

5    no -- February 1st to review matters

6    concerning ongoing litigation and

7    potential future litigation?

8          A      I don't really understand that

9    question.

10         Q      Well, do you disagree with

11   this statement that Mr. Blankenship made

12   in this excuse for Jessica to be out of

13   school that day?

14         A      That is true.

15         Q      That was my question.  You

16   don't disagree with it, then?

17         A      No.  That letter is true.

18         Q      The potential future

19   litigation, does that involve the school?

20         MR. JONES:  You can answer yes

21   or no without going into the details of

22   it.

23         A      Yes.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 43

1        Q        The Chilton County Board of

2   Education?

3        A        Yes.

4        Q        Does it involve Jessica

5   Wright?

6        A        Yes.

7        Q        Different from the lawsuit

8   that we're here about today?

9        A        I don't have to tell you that.

10       Q        Well, if it's potential future

11  litigation, is it different from the

12  lawsuit that we're about here today?

13              MR. JONES:  At this time, he's

14  going to assert his attorney/client

15  privilege to Mr. Blankenship.  He's told

16  you that it was to discuss other

17  litigation and that it concerned the

18  board, which is much more than he was

19  required to tell you.  So I think he's

20  answered the question.

21              MS. HORTBERG:  Are you telling

22  him not to answer my question?

23              MR. JONES:  Yes, I am.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 44

1    Q    (By Ms. Hortberg)  Do you

2  understand that this lawsuit was brought

3  on behalf of your daughter and not on your

4  own behalf individually?

5    A    Yes.

6    Q    You understand you're not

7  making any claims for yourself -- any harm

8  done for yourself in this case; right?

9    A    I think the complaint speaks

10  for itself.

11    Q    But do you understand that

12  that's what the lawsuit says, that you are

13  not making any complaint on behalf of

14  yourself for --

15    MR. JONES:  I'm going to

16  object to the form of the question.  The

17  lawsuit speaks for itself.  The four

18  corners of the lawsuit speaks for itself.

19    MS. HORTBERG:  Are you

20  directing him not to answer?

21    MR. JONES:  Repeat the

22  question.

23    Q    (By Ms. Hortberg)  Do you

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1  understand that this lawsuit is brought by

2  you and your ex-wife as parents and next

3  friends of Jessica and not on your own

4  behalf?

5          MR. JONES:  I'm going to

6  object to the form of the question to the

7  extent that it calls for a legal

8  conclusion or an opinion on the laws of

9  pleading.  Go ahead and answer her

10  question the best you can.

11          A      One more time.

12          Q      Do you understand that this is

13  not a lawsuit you brought about your own

14  damages?  This is about damages that

15  you're claiming on behalf of your

16  daughter?

17          A      I understand the complaint

18  from cover to cover.

19          Q      You've seen this before?

20          A      And I stand by that complaint.

21          Q      Did you see this before it was

22  filed?

23          A      Did I see that complaint

**www.AmericanCourtReporting.com**
**February 3, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 46

1  before it was filed?  Yes.

2      Q     Did you agree with all of the

3  factual assertions made in here?

4      A     Every assertion in it.

5      Q     What sort of services have you

6  lost from your daughter?

7      A     Services?

8      Q     Services.  You make a claim

9  for loss of services of Jessica.  What are

10  those services?

11      A     Let me see that.

12          MR. JONES:  It also says loss

13  of companionship, is what's in the four

14  corners of the complaint.  That's an

15  objection to the form of the question.

16          MS. HORTBERG:  I prefer you

17  just keep them to the proper objection.

18      A     We have suffered a loss of

19  companionship, society, confidence.

20  Before -- there once was a time that

21  Jessica loved Mr. Finlayson, and

22  somewhere, somehow he -- and she thought

23  that she could do anything, and she had

**American Court Reporting**
**toll-free (877) 320-1050**

Page 47

confidence to do anything.  And I believe

that's why she was such a high grade

student.  And somewhere down the line,

somehow, I believe that that man alone

totally destroyed her self-confidence, her

belief in herself, her belief in how the

system was fair, how she believed that

teachers were fair.  He changed her into a

negative, pessimistic person.

     Q     What are the loss of services,

sir?

     MS. HORTBERG:  And you'll note

he's reading from the complaint here.

     A     Oh, I am reading.  I'm going

to read before I answer a question.  I

believe that I answered it.  I thought

that I answered it.  Maybe you can expand

on the question a little bit, and I'll try

to help you.

     Q     Well, the question just is,

how have you lost Jessica's services?

     A     Well, there's two more things

in there, and it's how she -- in my

**American Court Reporting**
**toll-free (877) 320-1050**

1    opinion, it's how she has changed.  I'm

2    not an attorney, but I'm going to answer

3    the question to the best of my ability.

4          Q     So you've answered my question

5    to the best of your ability?

6          A     I have.

7          Q     Went through a list of

8    documents that have been requested of your

9    wife with her during her deposition, and I

10   believe you were sitting in here during

11   that time.  Do you have any documents that

12   your wife does not have related to this

13   lawsuit?

14         A     I do not.

15         Q     Do you have copies of your

16   state and federal income taxes for the

17   last five years?

18         A     I do.

19               MR. JONES:  Just a minute.

20   I'm going to interpose an objection.  I

21   told you earlier on the record that we're

22   going to respond to that.

23               MS. HORTBERG:  I've already

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1    told you those objections are waived, and

2    we'll take it up with the judge, but I'm

3    allowed to ask.

4              MR. JONES:  So you say.  He

5    does not have them here today.

6              MS. HORTBERG:  That's not what

7    I was asking.

8              MR. JONES:  What was your

9    question?

10             MS. HORTBERG:  If he has

11   them.

12             MR. JONES:  Answer her

13   question.

14        A    I do not.

15        Q    You don't have any tax

16   returns?

17        A    I have requested them.  I do

18   not personally --

19        Q    Of your accountant?

20        A    -- a copy for the past five

21   years.

22        Q    Who is your accountant?

23        A    Roy Burnette.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 50

1    Q    Is he here in Clanton?

2    A    He is.

3    Q    Is he a CPA?

4    A    I do not know.

5    Q    Is he the one that would have

6    prepared your taxes for the last five

7    years?

8    A    Yes.

9    Q    Have you made any claims to

10   any government organization, including the

11   state of Alabama or any county, city, or

12   other federal institution, about the

13   claims that we're here about today?

14   A    Is a school considered a

15   county institution?

16   Q    Besides any school.

17   A    No.

18   Q    Do you have copies of

19   Jessica's school transcripts?

20   A    Of course not.

21   Q    Do you have copies of any of

22   Jessica's report cards?

23   A    No.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 51

1    Q    What's your Social Security
2    number?
3    A    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.
4    Q    Date of birth?
5    A    5/3/62.
6    Q    Any other names you've ever
7    been known by?
8    A    No.
9    Q    Any other addresses besides
10   those given to us by your wife that you've
11   lived at since Jessica's birth?
12   A    No.  I don't know what
13   addresses she's given you.
14   Q    County Road 41 --
15   A    Okay.
16   Q    -- and your mother-in-law's
17   address in Skyline.  Any other places
18   you've lived besides the office that you
19   already gave me that address?
20   A    No.
21   Q    Do you remember your
22   mother-in-law's address in Skyline or
23   Scottsboro?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 52

1       A       I don't.

2       Q       Anybody else live there

3   besides Jessica, Emily, you, your wife,

4   and your mother-in-law?

5       A       Well, her father.

6       Q       What's his name?

7       A       Leon.

8       Q       Leon what?

9       A       Elliot.

10      Q       Does he still live in

11  Scottsboro?

12      A       He does.

13      Q       I forgot to ask your wife, but

14  do y'all have any relatives who would --

15  let's just say south of Birmingham, but,

16  you know, anywhere in the middle of the

17  state.

18      A       Do I have relatives?

19      Q       Uh-huh.

20      A       Yes.

21      Q       What are their names?

22      A       All of my relatives?

23      Q       Yes, sir.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1    A    I probably have hundreds.

2    Q    Would you provide a list to

3 your attorney, then?

4    A    Of all of my relatives?

5 That's pretty --

6         MR. JONES:  We will provide

7 them with what they're asking for.

8         THE WITNESS:  Okay.

9         MS. HORTBERG:  George, I'd

10 like those along with the interrogatory

11 responses.

12         MR. JONES:  She's asking that

13 for purposes of jury selection.

14         THE WITNESS:  Okay.

15    Q    (By Ms. Hortberg)  Have you

16 ever been employed in a school?

17    A    No.

18    Q    Have you ever been employed

19 anywhere where you've had to supervise

20 children?

21    A    No.

22    Q    Have you always maintained

23 custody over your two children?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 54

1    A    I've always maintained -- I've

2  had joint custody in the divorce.  Is that

3  what you're asking?

4    Q    Correct.  Has custody ever

5  been taken away from you?

6    A    No.

7    Q    Do you have any other children

8  besides Emily and Jessica?

9    A    No.

10    Q    Are you claiming lost wages

11  because of this lawsuit or because of

12  incidents alleged in this lawsuit?

13    A    I stand by the complaint and

14  what it says from the front to the back.

15    Q    If it says you're not claiming

16  lost wages in here, then you're not

17  claiming lost wages?

18    A    I stand by the complaint.

19    Q    I think we talked earlier

20  about -- that you had at least one

21  conversation with Mr. Finlayson during the

22  seventh grade year about Jessica, and

23  you've already described to me what

**American Court Reporting**
**toll-free (877) 320-1050**

1    occurred during the first one when you

2    talked about Mr. Baker.  Tell me when the

3    second meeting with Mr. Finlayson was.

4         A     The day that my wife was

5    substituting, and she called me from the

6    school and told me about him -- what he

7    did to Jessica, telling her that she was

8    on such a pity party.  And I told her -- I

9    said, I'm fixin' to go see him, and I did.

10        Q     Did you call and make an

11   appointment --

12        A     No, I did not.

13        Q     -- or did you just arrive

14   unannounced?

15        A     I went unannounced, politely

16   in the office and asked to speak to him.

17        Q     And did he say yes, I will

18   speak to you?

19        A     One of -- Ms. Gail or

20   Ms. Johnson, one, you know, called him up

21   to the office, and I waited until he could

22   see me.

23        Q     And he saw you?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 56

1      A      He did.

2      Q      Is this the meeting that you

3  all discussed Mr. Finlayson's son?

4      A      It is.

5      Q      Did you all discuss Jessica's

6  health condition and his son's health

7  condition and issues related to both of

8  those?

9      A      I guess that you could say so.

10     Q      Is that the first notice you

11 had that Mr. Finlayson had a disabled son?

12     A      No.

13     Q      You had heard that before?

14     A      Yes.

15     Q      From him?

16     A      No.

17     Q      First time he had ever said

18 that to you?

19     A      Yes.

20     Q      Did you all talk about his

21 discussion with Jessica being out of class

22 to go and see her mother while you were

23 there that day?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 57

1    A    As I recall, I went to -- not

2   only for that, but I went to try to bring

3   it to his attention of all of her needs

4   that weren't being done.

5    Q    So you did go and talk to him

6   about his discussion with Jessica from

7   earlier that day that your wife had called

8   you about?

9    A    About him telling her that she

10  was on a pity party, as I remember it

11  correctly, yes.

12   Q    That's your recollection of --

13   A    That is.

14   Q    -- the discussion with her?

15   A    Right.

16   Q    And what did he say to you

17  about that?

18   A    As I remember it, I never got

19  a clear answer.  He just wanted to tell me

20  all about his son.

21   Q    And did you listen to him when

22  he talked about his son's disability?

23   A    Obviously I did.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 58

1    Q    Did you discuss with him

2    anything about Mr. Baker and the whole not

3    being allowed to use the restroom on that

4    occasion --

5    A    Not that trip.

6    Q    Did you discuss with him about

7    Jessica being allowed to use the restroom

8    during that trip?

9    A    I'm sure that I did.

10    Q    Do you have a specific

11    recollection of that, sir?

12    A    No.

13    Q    What do you have a specific

14    recollection about discussing with

15    Mr. Finlayson besides what you've already

16    told me about?

17    A    About her needing unrestricted

18    access to the bathroom, needing to carry a

19    drink and snacks with her at all times,

20    and about anybody putting her down

21    anymore.

22    Q    When you left there, did you

23    feel there was a resolution?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 59

1        A       I did not.

2        Q       Did you call anyone else?

3        A       I believe I talked to Ann

4   Glasscock.

5        Q       Ms. Glasscock who is a board

6   member?

7        A       Who is a board member.

8        Q       You never called up here to

9   the board office, though; right?

10       A       I had Kathy to.  It was Ann's

11  advice for Kathy to call the

12  superintendent and speak with her, and she

13  did.

14       Q       You never spoke with the

15  superintendent?

16       A       No, I did not.

17       Q       And your wife testified

18  earlier she did not speak with the

19  superintendent?  But you don't have --

20       A       I didn't understand that.

21       Q       Well, the record will speak

22  for itself.

23       A       I think so.

Page 60

1    Q    So when you left, you did not

2    feel that there was a resolution, but you

3    talked to Ms. Glasscock?

4    A    I did talk to Ms. Glasscock.

5    Q    Where was this meeting?

6    A    At a restaurant.

7    Q    What restaurant?

8    A    San Marcos.

9    Q    What day was that?

10    A    I couldn't tell you.

11    Q    Did you just happen to run

12    into her there, or did you plan that

13    meeting?

14    A    We did.

15    Q    Who was with you?

16    A    My wife.  I don't remember if

17    our girls -- our children were with us

18    that time or not, but my wife was.

19    Q    Was this the same day that you

20    had the meeting with Mr. Finlayson a

21    second time?

22    A    No.

23    Q    How long afterwards?

**American Court Reporting**
**toll-free (877) 320-1050**

1    A    I'm going to say within a
2  week.  She gave us advice over months, you
3  know, of trying to handle these problems.
4    Q    I'm talking about this one
5  occasion where you saw Ms. Glasscock at
6  San Marcos.  When did that occur?  How
7  long after your meeting with
8  Mr. Finlayson?
9    A    I'm going to say within two
10 weeks.
11    Q    I'm going to ask you not to
12 guess here.  Do you have --
13    A    Within two weeks.
14    Q    I will also remind you that
15 you're under oath.
16    A    I am.
17    Q    You never made any sort of
18 written request to Mr. Finlayson or to
19 anyone up here at the central office for
20 any sort of IEP meeting for Jessica;
21 right?
22    A    No.
23    Q    You never made a verbal

**American Court Reporting**
**toll-free (877) 320-1050**

Page 62

1    request to anyone for an IEP meeting for

2    Jessica; right?

3        A    I didn't understand the term

4    "IEP".  I never knew what IEP was.

5        Q    So you never made such a

6    request; correct?

7        A    I did request to Mr. Finlayson

8    that if Jessica -- if there was any way --

9    anything he could help her, you know, that

10   we needed to do it or try to do it.  I did

11   do that.  He assured me he would do

12   everything he could to help her.

13       Q    Sir, is your answer no, you

14   never made a verbal request to anyone for

15   an IEP meeting?

16       A    I'm not an attorney, and I

17   didn't know what an IEP was.

18       Q    Your answer is no, then;

19   correct?

20       A    Correct.

21       Q    And then you never made a

22   written complaint about any sort of denial

23   of services of Jessica; correct?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 63

1    A    I did not.

2    Q    Did you ever make a written

3 request for a due process hearing to

4 anyone at the Chilton County Board of

5 Education?

6    A    I'm not an attorney.  I didn't

7 know anything like that was available.  I

8 didn't understand 504, IDA, IDE, or

9 anything.

10    Q    Is your answer to that

11 question no, you did not make such a

12 written request for a due process hearing

13 to anyone at the Chilton County Board of

14 Education?

15    A    No.

16    Q    Did you ever make a verbal

17 request to anyone at the Chilton County

18 Board of Education for a due process

19 hearing?

20    A    No.

21    Q    Have you ever seen a copy of

22 this Chilton County Schools Student/Parent

23 Information Guide?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 64

1    A    I have.

2    Q    Were you ever one of the ones

3    that signed the parent acknowledgment or

4    any of the medical forms in here?

5    A    I could have been.

6    Q    You don't remember

7    specifically?

8    A    I do not.

9    Q    Did you ever read through this

10   when Emily or Jessica brought it home?

11   A    I think so.

12   Q    Do you remember what year

13   Jessica would have been in school when you

14   read it?

15   A    Probably last year.  Probably

16   the seventh grade.

17   Q    Did you ever meet Ms. Martin?

18   A    I did.

19   Q    Did you agree with your wife

20   that Ms. Martin was very understanding

21   about the situation with Jessica being

22   moved from the gym into Ms. Martin's

23   class?

**American Court Reporting**
**toll-free (877) 320-1050**

1      A      I don't recall specifically

2  ever a conversation in my presence with

3  Ms. Martin about that.  When I would see

4  and speak with Ms. Martin would be at the

5  ballgames where Jessie was cheerleading.

6  She would come and sit by us and talk to

7  us just about every game, you know, and

8  speak to us and see how Jessie was doing.

9      Q      Did you know that your wife

10 had written this letter to Mr. White in

11 August of 2004?

12     A      Let me see the letter.

13     Q      Sure.

14     A      I did.

15     Q      Besides those two discussions

16 with Mr. Finlayson, did you have any

17 others with him during the seventh grade

18 year?

19     A      I don't think so.

20     Q      What about during the eighth

21 grade year?  Have you had any meetings

22 with Mr. Finlayson?

23     A      I don't think so.

**www.AmericanCourtReporting.com**
**February 3, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

1    Q    What about during the seventh

2  grade year?  Have you ever had any

3  meetings with Ms. Ellison or anyone up

4  here at the board of education?

5    A    Only with Ann Glasscock, and

6  it was not here.

7    Q    At a restaurant when you ran

8  into her?

9    A    Right.

10    Q    Or when your daughters were

11  together?

12    A    Right.

13    Q    During eighth grade here, have

14  you had a meeting with Ms. Ellison or

15  anyone else from the Chilton County Board

16  of Education up here at the central

17  office?

18    A    No.

19    Q    Have you requested any such

20  meeting?

21    A    No.

22    Q    In the sixth grade, did you

23  request any such meeting of Ms. Ellison?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 67

1    A    I need to back up.  Are you
2    talking -- when you said the board of
3    education, are you talking about, like,
4    with a teacher this year?
5    Q    No.  I'm talking about the
6    central office, where we are today.
7    A    Okay.  No.
8    Q    Where the administration is.
9    A    No, not this year.  Not nobody
10   here.
11   Q    You've never had a meeting
12   with anybody here at the -- who is
13   employed at the central office?
14   A    No.
15   Q    Did you attend the meeting
16   that your wife had about the nurse being
17   at the school this year?
18   A    The lady from out here that's
19   over that -- and I don't remember her
20   name -- called the house.  I think her
21   name was -- you said Lynn Boyd earlier,
22   and I think -- that rung a bell.  I think
23   that was her name.  She called and spoke

**American Court Reporting**
**toll-free (877) 320-1050**

Page 68

1  with me at least on two occasions when

2  Kathy wasn't there regarding that nurse,

3  you know, being at that school is going to

4  take care of Jessica.  If that's what

5  you're asking.

6        Q     And did you agree that the

7  nurse should be at the school?

8        A     I did.

9        Q     Is that because that Jessica

10 was diagnosed with diabetes this past

11 summer?

12       A     Not entirely.  I thought that

13 this nurse might understand her condition

14 a little more and see that she got the

15 treatment that she needed there.  But

16 we've been told that that nurse -- I mean,

17 she says herself that Mr. Finlayson is

18 trying to push her off into being a

19 teacher here and there.  She can't even do

20 her whole job as a nurse there.  I mean,

21 she'll even tell you that now.

22       Q     Well, Jessica testified that

23 the nurse watches her and helps her

**American Court Reporting**
**toll-free (877) 320-1050**

Page 69

1   administer her treatments at eleven and

2   noon every day; correct?

3        A     That's true.  Before the

4   nurse, Ms. Johnson dropped her medicine on

5   the floor, and, I mean, she picked it up

6   and blew it off herself and handed it to

7   her to take.  I mean, that's what went on

8   down there.  That's why they needed that

9   nurse.

10        Q     And Jessica testified to that

11   one occasion earlier.

12        A     Did she?

13        Q     Yes.  You were in here,

14   weren't you?

15        A     I didn't hear that.

16             MS. HORTBERG:  I think that's

17   all I have, George.

18

19   EXAMINATION BY MR. JONES:

20        Q     Mr. Wright, you testified just

21   a little while ago about your conversation

22   or conversations with Ann Glasscock.  Do

23   you recall that?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 70

1     A      I do.

2     Q      I believe you stated that she

3  had given you some advice; is that

4  correct?

5     A      Maybe me and my wife together,

6  you know, while we were sitting, eating.

7  But she advised my wife all along.

8     Q      Well, what did she advise you,

9  if anything, on that occasion?

10         MS. HORTBERG:  Object to the

11  form.

12         MR. JONES:  Noted.

13     Q      You can answer.

14     A      That Kathy should contact the

15  superintendent.

16     Q      Anything else?

17     A      Maybe not on that occasion.

18  On other occasions I recall, you know.

19     Q      On that specific occasion, did

20  Ann Glasscock say anything critical of the

21  superintendent?

22         MS. HORTBERG:  Object to the

23  form.

**American Court Reporting**
**toll-free (877) 320-1050**

1      A      No, not of the superintendent.

2      Q      Did she say anything critical

3  about anybody associated with the school

4  board?

5              MS. HORTBERG:  Object to the

6  form.

7      A      Not of the school board.

8      Q      What effect emotionally have

9  the matters that are set forth in this

10 lawsuit caused you?

11             MS. HORTBERG:  Object to the

12 form.

13     A      Well, if you can imagine

14 Jessica going from wanting to go to school

15 even when --

16     Q      I'm not talking about Jessica.

17 I'm talking about you.

18     A      Oh, talking about me?

19     Q      Uh-huh.

20     A      Well, when she comes in

21 because somebody has mistreated her at

22 school, and she's upset and stays in her

23 room and squalls herself to sleep, it's

**American Court Reporting**
**toll-free (877) 320-1050**

Page 72

1    hard to sleep at night without thinking

2    about that.  I mean, it hurts you.  When

3    you have to push her to go to school in

4    the morning, I mean, that does something

5    to you.  When once she'd go to school --

6    even when she was too sick to go, she

7    wanted to go.  I mean, that's what

8    happened.  And it is, you know,

9    emotionally stressful.

10           Q       To you?

11           A       It is.

12           Q       Tell us what else you've

13   experienced.

14           MS. HORTBERG:  Object to the

15   form.

16           Q       If anything.

17           A       I just worry about her being

18   mistreated at school.  I worry about what

19   they're going to do next.

20           Q       Now I want to ask you about

21   Jessica.  Tell us how her emotional state

22   has been.

23           MS. HORTBERG:  Object to the

**American Court Reporting**
**toll-free (877) 320-1050**

1    form.

2         A     Jessica, as I described

3    earlier, used to be so enthusiastic and

4    have confidence so in herself that she

5    could do anything, and she's completely

6    turned around now.  She does not believe

7    in herself.  She to a sense has sort of

8    just went into her little shell.  She

9    stays in her room a lot by herself.  She

10   doesn't believe in people to talk to them

11   anymore to take care of her problems

12   because she just don't think anybody can

13   help when she has a problem.  It's just

14   completely changed her, this situation

15   has.

16        Q     I want you to look at

17   Defendants' Exhibit 1.  You looked over

18   that letter earlier.  Do you recognize it?

19        A     I do.

20        Q     What is it?

21        A     It was a plea.  It was a plea

22   actually.  That's how, you know --

23        Q     A plea for what?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 74

1      A      A plea to the -- to the
2   superintendent to please do something
3   about this situation.
4      Q      Did you ask Mr. Blankenship to
5   send this letter?
6           MS. HORTBERG:  Object to the
7   form.
8      A      I talked to him about the
9   problem and asked him what he thought
10  could be done; if anything could be done.
11     Q      Was this letter sent with your
12  consent?
13     A      Yes.  And another one.
14          MS. HORTBERG:  Objection.
15     Q      Now, you testified that after
16  you visited with Mr. Finlayson concerning
17  the Baker incident that you didn't feel
18  that there had been a resolution; is that
19  correct?
20          MS. HORTBERG:  Object to the
21  form.
22     A      No.
23     Q      Why is it that you did not

**www.AmericanCourtReporting.com**
**February 3, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

1    feel there was a resolution?

2        A       She still had problems.

3        Q       What kind of problems?

4        A       From time to time, I mean, she

5    just would still have problems at school;

6    I mean, about eating, about carrying her

7    drink, about --

8        Q       Well, you've got to be

9    specific.  What sort of problems?

10       A       Okay.  If she needed to go to

11   the restroom and somebody wouldn't let her

12   go to the restroom right now, her stomach

13   would cramp her until she released gas.

14   And it's the most smelly gas you can think

15   of, and her classmates make fun of her.

16   I've heard her classmates at the house, a

17   lot of them there, you know, to stay with

18   and everything and -- make fun of her.

19   But what happened at school, you know,

20   I've heard it.

21       Q       What else other than that?

22   What else has she complained to you about?

23       A       From school?  Well, the things

**American Court Reporting**
**toll-free (877) 320-1050**

Page 76

1    I was telling you.  Just her stomach
2    cramps and problems that she has.  Like,
3    cystic fibrosis affects every organ in
4    your body.
5        Q    How did the subject of
6    Mr. Finlayson's son come up during the
7    meeting?
8        A    He brought it up.
9        Q    What did he say?
10       A    Basically that his son went
11   through the school system and with a --
12   you know, a severe disability; one that I
13   think he likes to weigh against other
14   people's disability and thinks that maybe
15   his son's is a worse disability, and how
16   his son got no help and how his son is out
17   of school now and graduated and works a
18   full-time, forty week job.  And if his son
19   can do that, other people don't need any
20   help either.  That's the way I saw his
21   attitude.
22       Q    Did he use those words?
23            MS. HORTBERG:  Object to the

Page 77

1    form.

2         A     Pretty much.

3         Q     Do you recall if you made a

4    response to what he was saying?

5               MS. HORTBERG:  Do you recall

6    if who made a response?

7               MR. JONES:  Mr. Wright.

8               MS. HORTBERG:  Object to the

9    form.

10        Q     Do you recall if you made a

11   response?

12        A     I politely, you know, as

13   nicely as I could, you know, concluded the

14   meeting and left.  Even the teachers down

15   there talk about how he did his son.

16        Q     What teachers?

17        A     The teachers that work for

18   him.

19        Q     Can you give us names?  Can

20   you remember what he did to his son?

21              MS. HORTBERG:  Object to the

22   form.

23        Q     Go ahead.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 78

1      A      He wouldn't let his son have

2  any -- wouldn't let, you know, his son get

3  help.

4      Q      They didn't go into details?

5      A      No.

6      Q      I want to direct your

7  attention back to your testimony about

8  your meeting with Ann Glasscock.  Do you

9  recall anything else about the meeting as

10 to why she told your wife to go to the

11 superintendent?

12             MS. HORTBERG:  Object to the

13 form.

14      A      She told my wife there was a

15 procedure you had to go through, and I

16 don't remember that procedure, but I think

17 that it started with the superintendent.

18 Then if the superintendent didn't resolve

19 your complaint or whatever, then you could

20 go before the board of education and so

21 forth.  But she said if the superintendent

22 didn't resolve it, you know, there wasn't

23 really any use to go any further.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 79

1    Q    Do you recall whether or not

2    that was before or after Mr. Blankenship

3    sent his letter?

4    A    I think that was before.

5         MR. JONES:  Pass the witness.

6         MS. HORTBERG:  We need to take

7    a quick break.

8              4:46 p.m.

9           (Recess taken)

10             5:04 p.m.

11         MS. HORTBERG:  I'm done.

12

13         FURTHER DEPONENT SAITH NOT

14

15

16

17

18

19

20

21

22

23

**American Court Reporting**
**toll-free (877) 320-1050**

Page 80

1               C E R T I F I C A T E

2

3   STATE OF ALABAMA    )

4   MONTGOMERY COUNTY   )

5           I hereby certify that the above

6   and foregoing deposition was taken down by

7   me in stenotype, and the questions and

8   answers thereto were transcribed by means

9   of computer-aided transcription, and that

10   the foregoing represents a true and

11   correct transcript of the deposition given

12   by said witness upon said hearing.

13           I further certify that I am

14   neither of counsel nor of kin to the

15   parties to the action, nor am I in anywise

16   interested in the result of said cause.

17

18

                    GWENDOLYN P. TIMBIE, CSR

19                    Certificate No:  AL-CSR-569

20

21   My Commission Expires

    March 4, 2009

22

23

**www.AmericanCourtReporting.com**
**February 3, 2006**

# EXHIBITS



# BRANDON L. BLANKENSHIP, L.L.C.
### COUNSELOR AT LAW
1901 Sixth Avenue North, Suite 3120
(Post Office Box 13067 - 35202-3067)
BIRMINGHAM, ALABAMA 35203-4637

Telephone: (205) 326-1311

Facsimile: (205) 326-1377

## FACSIMILE COVER SHEET

TO: _Ben Wright_ _____ DATE: _3 FEB_ , 2006

COMPANY: _____

FROM: _John Shivick_ _____

FAX NO.: ( _____ ) _____ OUR MATTER NO.: _____

RE: _____

MESSAGE: _See letter —_ _____

_____

_____

_____

_____

_____

_____ Pages *Including* This Cover Sheet

If there is a problem with this transmission or if all pages are not received, please contact the firm.

### CONFIDENTIALITY NOTICE:

The information contained in this facsimile transmission is CONFIDENTIAL and may be protected by one or more legal privileges. It is intended solely for the use of the recipient identified above. If you are not the intended recipient, you are hereby notified that reading, copying, and/or distributing this transmission is STRICTLY PROHIBITED. The sender has not waived any applicable privilege by sending the accompanying transmission. If you have received this transmission in error, please notify the sender immediately by telephone and we will arrange to have the transmission returned at no cost to you.

Thank you.



Writer's Extension: 222
Writer's Email: bblankenship@gilbertcookpc.com

March 9, 2005

John Hollis Jackson, Jr.
Jackson & Jackson, LLP
Post Office Box 1818
Clanton, AL 35046

RE:    Jessica Nicole Wright, DOB: February 13, 1992, SSN: XXX-XX-7105

Dear Mr. Jackson,

Thank you for talking with me yesterday regarding the referenced child.  Jessica is terminally ill from a genetic disorder - Cystic Fibrosis.  I believe she would qualify as a special needs child under the category of Other Health Impaired.

The complaint is that Jessica, in spite of the fact that she was a junior high cheerleader last year, recently tried out to be a junior high cheerleader and other girls who were related to the judges were privileged over her.

Without reaching any judging irregularities, I believe the school may reconsider its position based solely on Jessica's IEP.  I have worked with other children who were able to show that extracurricular activities or even at home activities were an essential part of their IEP.  In some of those situations, the expense to the Board was relatively heavy.  Here, I believe I can bring an expert to show that in Jessica's situation cheerleading is a unique method of addressing Jessica's disability while keeping her in a mainstream environment.  It is a cost effective way for the school to accommodate Jessica in that the physical activity of cheerleading itself provides a replacement for a physical therapist and the comradery with the other cheerleaders provides a replacement for outside tutoring.  I would also draw your attention to the fact that while Jessica was cheerleading last year her attendance was markedly improved.  Not only would this support an expert's findings in favor of Jessica on this issue, it would also seem to reduce the expense and hassle to the school in not having to accommodate Jessica for the days she had to be out due to her disability.

As we discussed, I will be out of the state until Monday.  I will check with you then.  If you need me before then, leave me a voice mail and I will call you back and if ever I can assist you, please promptly call on me.

Very truly yours,



Brandon L. Blankenship
For the Firm

Rec 8/25/04

DEFENDANT'S
EXHIBIT
2

Mr. White,

Because of Jessica's CF she dehydrates very easily and with her being outside and in the hot gym for 2 classes a day is making her not feel very good. Mrs. Martin told her that she could use her to help. I wish that you would change to being Mrs. Martin's helper. Call me if you need anything. 280-3748 or 389-5452 (cell). I think the sinus infection that she is getting now is because of going in and out from hot to cold. She really does love all of you there at Adair. You have all been so understanding and gotten us through some tough times.

Thanks,
Kathy Wright